ELGIN CITY BANKING COMPANY *v.* JEFF HALL *et al.*

(*Knoxville.* September Term, 1907.)

1. **BILLS AND NOTES.** Procured by fraud are not enforceable as between the original parties.

Where the agent of the owner of a horse in selling him represented to five of the buyers that three other named persons with whom he had secretly arranged to pay two of them a consideration and to release another from the payment of the purchase price, for the use of their names as buyers, were to become equal partners in the purchase of the horse, the notes executed by the individuals, thus imposed upon, for the price of the horse were procured by fraud, and are not enforceable as between the original parties. (*Post, pp.* 551-557, 566.)

2. **SAME.** Indorsement "without recourse" does not impair their neg·tiability.

The indorsement of a negotiable instrument "without recourse" is not sufficient to put the purchaser upon notice, and it does not impair the negotiable character of the instrument. (*Post, pp.* 558, 559.)

Acts cited and construed: Acts 1899, ch. 94, sec. 38.

3. **SAME.** Indorsement in blank is not nullified by an indorsement of guaranty following it.

The blank indorsement of a negotiable instrument is not nullified by another indorsement following after it and guaranteeing the payment thereof with a greater rate of interest, and the costs of collection, and waiving demand of payment and notice of nonpayment. Whether such indorsement of guaranty without the prior blank indorsement would destroy the negotiability of the instrument is reserved as unnecessary to be determined. (*Post, pp.* 559, 560.)

Banking Co. v. Hall.

Cases cited and approved:    Banking Co. v. Zelch, 57 Minn., 487; Cover v. Myers, 75 Md., 406; Trust Co. v. Railroad, 75 Fed., 433.

**4. SAME. Remedy against guarantor in an absolute guaranty.**

Where the guaranty of a note is absolute no demand or exhaustion of the maker is required, nor is any notice of acceptance or default required. (*Post, pp.* 562, 563.)

**5. SAME. Same. Instance of an absolute guaranty.**

Whether the guaranty of a note stipulates that the maker will pay, or whether it stipulates that the guarantor will pay, the underaking is absolute whether the maker is solvent or not, and the guarantor must pay the amount or see that it is paid. It is not the case of a guaranty of the solvency or collectibility, which requires previous demand and suit. (*Post, p.* 563.)

Case cited and approved:    Klein v. Kern, 94 Tenn., 34, 37. .

**6. SAME. Bank giving indorser credit on his account for proceeds of note discounted is not a purchaser for value.**

Where a bank simply discounts a note and credits the amount thereof on the indorser's account, without paying to him any value for it, it does not *prima facie* become a *bona fide* purchase for value, since the proceeds of the discount may be credited to the bank by making a change of entry on its books. (*Post, p.* 564.)

Case cited and approved:    Warman v. Bank, 185 Ill., 60.

**7. SAME. Purchaser is holder for value and in due course of trade, when.**

A purchaser of commercial paper is a holder for value and in due course of trade, when he has given for the note his money, goods, or credit, at the time of receiving it, or has on account of it sustained some loss or incurred some liability. (*Post, pp.* 560-562, 565.)

Banking Co. v. Hall.

Acts cited and construed:     Acts 1899, ch. 94, secs. 25, 26, 52, 55, 56, 57, and 59.

Cases cited and approved:     Nichol v. Bate, 10 Yerg., 429; Kimbro v. Lytle, 10 Yerg., 417; Bank v. Johnston, 105 Tenn., 521.

8.  SAME.  Bank purchasing note and obtaining credit for seller in another solvent bank is holder for value.

A bank discounting a note and obtaining credit in favor of the indorser in another solvent bank for the amount of the discounted paper is a holder for value. (*Post, pp.* 564, 565.)

9.  SAME.  Same.  Testimony must show in what way credit was given.

Testimony that the purchaser paid for the note the full amount thereof by giving the seller credit for the amount at named bank, without showing how the credit was given, or that it was ever used, does not show the purchaser to be a holder for value, since the court cannot determine whether or not the credit was real and substantial. (*Post, pp.* 565, 566.)

10.  SAME.  Burden rests on purchaser to show that he was a holder for value, when.

In an action on a note by the purchaser thereof against the makers, defended on the grounds that it was procured by the fraud of the payee, as shown in the first headnote, and that the purchaser was not an innocent purchaser for value, the burden of proof rests upon the complainant to show that he was a holder for value. (*Post, p.* 566.)

---

FROM BRADLEY.

---

Appeal from the Chancery Court of Bradley County.— T. M. McConnell, Chancellor.

Wheeler & Trimble, for complainant.

Banking Co. v. Hall.

MAYFIELD & MAYFIELD, for defendants.

MR. JUSTICE MCALISTER delivered the opinion of the court.

This bill was filed by the Elgin City Banking Company, a corporation chartered under the laws of the State of Illinois, and having its *situs* and principal place of business at Elgin, in said State, against the defendants, who are all residents of Bradley county, Tennessee, for the collection of two promissory notes, together with the accrued interest. Complainant claims to be an innocent holder of said notes, and purchased them before maturity, in due course of trade, without notice of any outstanding equities against them. A copy of one of said notes, together with the indorsements thereon, is in the words and figures following, to wit:

"400.00              Cleveland, Tenn., Oct. 1st, 1903.

"On or before the first day of September, 1905, for value received, we jointly and severally promise to pay to the order of Dunham, Fletcher & Coleman, of Wayne, Ill., four hundred dollars ($400.00), payable at the Cleveland National Bank, with interest at five per cent. per annum, payable anually from date, until paid.

                         "JEFF HALL.
                         "C. T. CARROLL, JR.
                         "L. L. CALLAWAY.
                         "L. P. SULLIVAN.
                         "T. J. McKAMY.
                         "EDWARD H. THURSTON."

"Pay to the order of W. S., J. B. & B. Dunham, without recourse to us.

           "DUNHAM, FLETCHER & COLEMAN."

"W. S., J. B. & B. Dunham."

"For value received, we hereby guarantee,˙ the payment of the within note at maturity, or at any time . thereafter, with interest at five and one-half per cent. per annum until paid, and we agree to pay all the costs and expenses paid or incurred in collecting the same, hereby waiving demand of payment and notice of nonpayment.

           "W. S., J. B. & B. DUNHAM."

Defendants answered the bill, in which they admitted the execution of the notes, but denied that complainant, is an innocent purchaser of said notes, for value, and in due course of trade. It is averred that said notes were procured by fraud and misrepresentation on the part of Dunham, Fletcher & Coleman, the payees; and as a further defense it is averred that the consideration for said notes has wholly failed.

The more specific averments of the answer are that the notes in suit represented in part the purchase price ($1,600) of a certain horse; that at the time of said purchase the payees, Dunham, Fletcher & Coleman, delivered to respondents a written statement or guaranty of the soundness of said animal and that he possessed all the qualities represented by the seller, but on delivery of the horse it was soon ascertained that he was a stump

sucker and did not in any respect possess the quali-
ties guaranteed by said seller.   When said facts were
communicated to the seller, said firm agreed to receive
back the horse, and agreed with two of the purchasers
to ship another horse to Cleveland in place of the first,
which was accordingly done.   It is then averred that the
second horse was of a notoriously diseased breed of
horses, and was not only thus diseased, but was not up
in other respects and qualities to the warranty of the
seller, all of which facts were fraudulently concealed
from the purchasers.   It is then averred that the second
horse so shipped to Cleveland died within about two
months after his arrival, as a result of his diseased con-
dition at the time he was shipped; and respondents aver
that said sellers, as horse dealers, must have known of
the diseased condition of this horse, but fraudulently
concealed the same from respondents.

It is further averred that the agent of the payee of
said notes, at the time the defendants agreed to pur-
chase the horse, made secret and fraudulent contracts
with certain of said purchasers, in whose judgment as
horsemen defendants had confidence, whereby said par-
ties were induced to represent themselves as willing to
enter into said purchase as equal partners, and pre-
tended to join with defendants as purchasers, and also
pretended to pay or become liable for said sum of $200
each for a one-eighth interest in said horse, for the fraud-
ulent purpose of inducing defendants to enter into said
contract; whereas, in-fact, neither of the parties to said

secret contract contributed said sum of $200, but by the agreement with said seller were either paid large sums in cash to wit, from $50 to $100, or were given a one-eighth interest free of charge, to have them passed as equal partners or purchasers, and induce defendants to enter into said contract and become liable for said purchase money.

It is averred that the purchase by each of the said eight alleged purchasers was a material part of the consideration for said purchase by all the other purchasers. Defendants, therefore, aver that, because of the fraud, misrepresentations, and concealments on the part of the payees in procuring said contract and notes, and because of said failure of consideration they are not liable to complainants for the amount of said notes or other sum.

It appears that the notes in question were indorsed by the payees, Dunham, Fletcher & Coleman, to another firm, of which W. S. Dunham was a member, and by that firm transferred before maturity to complainant bank. It is claimed by the complainant that it had no notice of any equities existing against the notes. The complainant bank claims to have purchased the notes by placing the amount paid for them to the credit of W. S., J. B. & B. Dunham (the second indorsers, for whom the notes were discounted) in the First National Bank of Elgin, Ill., a different bank from complainant, which is the Elgin City Banking Company, as already stated.

Proof was taken and on the hearing the chancellor

was of the opinion that the complainant did not give value for the notes; he holding that the defenses alleged were good against the original payee and therefore good also against the complainant. The chancellor was of opinion that the complainant was not an innocent holder of the paper and that the defense set up in the answer had been established by the proof, and he accordingly dismissed the complainant's bill. The complainant appealed, and has assigned errors.

The first inquiry naturally arising is whether there was fraud in the original inception of this contract, for which the notes in question were executed in part fulfillment.

It is shown on the record that one Campbell, the agent of the payees, Dunham, Fletcher & Coleman, brought the first horse in question to Cleveland, and, having failed to sell him, proposed to six of the defendants to purchase the horse for $1,600, as equal partners. It is shown by the proof that said agent stated to the defendant E. H. Thurston that several others would join in the purchase if Thurston would become interested, and proposed that Thurston should hold himself out as a purchaser and affect to pay said sum of $200 with the others, but he should pay only $100, and the remaining $100 would be repaid to him; and it is shown that Thurston, under this secret contract, did thereafter pretend to join with the others as an equal partner in said purchase. It is also shown that said seller approached one M. L. Beard, of Cleveland, an old and experienced

dealer in horses, and on whose judgment the other pur-
chasers relied, and proposed that said Beard should also
become a colorable purchaser, and should receive a one-
eighth interest in said horse gratis if he would profess
to join in said purchase; and under this agreement,
Beard did thereafter pretend to be a bona fide pur-
chaser, and permitted the seller to so represent him.
The seller not only represented Beard as one of the pur-
chasers, but some of the other purchasers were referred
to him for his judgment as to the merits of the horse.

It is also shown that said agent agreed with J. T.
Hall, another of said purchasers, to pay said Hall the
sum of $50 for his services in inducing the others to
join in said purchase. It is shown that none of the other
purchasers knew or suspected these secret and fraudu-
lent contracts had been made, but supposed that all the
others were entering into the purchase on equal terms
of partnership. It was represented to the five pur-
chasers who received no secret consideration that seven
others had agreed to join, and that it was only neces-
sary that he agree to join to complete the purchase. It
is further shown that when the eight purchasers met
with said seller to complete the purchase and sign the
notes for the purchase money, Thurston and Hall, at
the request of the seller, signed the notes with the
others, and the seller then secretly paid to them in cash
the sums of $100 and $50 respectively, according to their
secret arrangement. The seller also desired said Beard
to sign said note and receive $200 in cash; but Beard ob-

jected to this, and it was thereupon announced to the others that Beard was paying his part of the purchase money to said seller in cash, but in fact nothing was paid by him. It is shown that one of said purchasers, G. W. Day, paid the seller the sum of $200 in cash, and this, with the $200 alleged to have been paid by said Beard, left a balance of $1,200, and for this sum the six defendants executed three notes, each for $400, due, respectively, on or before September 1, 1905, 1906, and 1907, with interest at 5 per cent., payable annually. It is also shown by the proof that, while the agent made many representations and warranties as to the soundness and fine breeding qualities of the animal, he carefully kept the horse in a locked box stall before the sale, where he could not be seen, except when taken out by the seller for inspection; but within a few days after the purchase it was discovered that the animal was unsound. When the seller was notified of this, he took back the horse and sent another in exchange. This new contract was negotiated by Thurston and Hall, two of the alleged purchasers, who had been secretly paid to enter into the original contract. The second horse, as already seen, died about two months after he was received.

We think, upon the facts shown in the evidence, that this contract and these notes were not enforceable against the original makers, on account of the fraud and misrepresentation practiced by the agent of the payees, Dunham, Fletcher & Coleman.

The question remains whether the complainants were innocent purchasers of said note for value, before maturity, in due course of trade, without notice of any of the infirmities in said notes.

As already seen, said notes were first indorsed "without recourse" by Dunham, Fletcher & Coleman, the payees, to W. S., J. B. & B. Dunham, and said notes were then delivered to complainant bank by said W. S., J. B. & B. Dunham under a written guaranty on the back of the notes, by which said firm guaranteed the payment of said note with interest at five and one-half per cent. per annum, together with all the costs and expenses of collection, and also waived demand and notice of nonpayment.

It is suggested that the indorsement "without recourse" was sufficient to put the purchaser upon notice, and destroyed the negotiability of the instrument; but we think it is well settled that an indorsement without recourse is not sufficient to put the purchaser upon notice. 2 Randolph, Commercial Paper, section 1008; 7 Cyc., 954, and numerous cases cited.

Moreover, the matter is set at rest by our negotiable instrument law (Acts 1899, p. 148, c. 94 section 38), wherein it is provided that "such an indorsement does not impair the negotiable character of the instrument."

Again, it is insisted that complainant bank holds another indorsement or guaranty by which the guarantors agree to guarantee payment of the note at a different and higher rate of interest than the note bears, and

also guarantee payment of all expenses of collection, whereas the notes themselves contained no such provision.

It has been observed that the notes bear interest at five per cent., while the guarantors agreed to pay interest at five and one-half per cent. It is argued that this is a new, independent, and different contract, and not merely a transfer of the notes. It is conceded that many of the authorities hold that a mere guaranty of a note will constitute the purchaser an indorsee, within the rule protecting an innocent holder; but it is insisted that this rule cannot apply to a guaranty changing the rate of interest and also agreeing to pay expenses of collection. It is argued that, if this can be done without destroying the negotiability of the paper, then each indorsee can, of course, change the rate of interest or the amount of the note, and each be liable for a different amount.

It is unnecessary to decide this question, since it appears that the notes were indorsed in blank by W. S., J. B. & B. Dunham, and the guaranty did not, of course, nullify their prior blank indorsement.

In *Elgin City Banking Co.* v. *Zelch*, 57 Minn., 487, 59 N. W., 544, the indorsements were:

"Pay Elgin City Banking Co. D. Dunham."

"Payment guaranteed. D. Dunham."

The court said:

"Whether these indorsements be construed as constituting a single contract, or two separate and distinct

contracts, we are clear that they constitute indorsements in the commercial sense, and that the transferee is an indorsee, and entitled to protection as such under the law merchant. The fact that Dunham enlarged his responsibility beyond that of an indorser by guaranteeing payment did not change or affect the character of his indorsement."

In *Cover* v. *Myers*, 75 Md., 406, 23 Atl., 850, 32 Am. St. Rep., 394, it is held that a guaranty added to an indorsement is not notice of defenses. *Louisville Trust Co.* v. *L., N. A. & C. R. Co.*, 75 Fed., 433, '22 C. C. A., 378.

The determinative question presented on the record is whether the complainant bank is a holder for value. Our negotiable instrument law (section 25) provides:

"Value is any consideration sufficient to support a simple contract. An antecedent or pre-existing debt constitutes value and is deemed such whether the instrument is payable on demand, or at a future time."

"Sec. 26. Where value has at any time been given for the instrument, the holder is deemed a holder for value in respect to all parties who became such prior to that time."

"Sec. 52. A holder in due course is a holder who has taken the instrument under the following conditions: .

"(1) That it is complete and regular upon its face.

"(2) That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact.

"(3)   That he took it in good faith and for value.

"(4)   That at the time it was negotiated to him he had no notice of any infirmity in the instrument, or defect in the title of the person negotiating it."

"Sec. 55.   The title of a person who negotiates an instrument is defective within the meaning of this act, when he obtained the instrument, or any signature thereto, by fraud, duress or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud.

"Sec. 56.   To constitute notice of an infirmity in the instrument, or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.

"Sec. 57.   A holder in due course holds the instrument free from any defect of title of prior parties, and free from defenses, available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon."

"Sec. 59.   Every holder is deemed prima facie to be a holder in due course, but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that

he, or some person, under whom he claims acquired the title as a holder in due course."

While we find some facts and circumstances in the record tending to show that complainants were put on inquiry as to defenses against this note, we cannot say that complainant "had actual knowledge of the infirmity or defect or knowledge of such facts that its action in taking the instrument amounted to bad faith."

It is matter for observation that at the time of purchasing this paper the officials of the complainant bank made no inquiry in respect of the makers or as to the consideration of the notes, although it is admitted they knew nothing as to the commercial standing or solvency of the makers.

Again, it appears that in enforcing the collection of the notes complainant has ignored the guarantors and is only suing the original makers. This is worthy of comment, since the guaranty was for the payment of all expenses of collection and additional interest. It appears the guarantors are solvent and reside within seven miles of complainant's place of business, and yet, passing them, complainant sent this paper to Cleveland, Tennessee, for collection, thereby seeking a lower rate of interest and incurring attorney's fees in the prosecution of the suit. There was no obstacle in the way of a primary suit against the guarantors on this form of guaranty. It is well settled in Tennessee that, when the guaranty is absolute, no demand or exhaustion of the maker is required; nor is any notice required of the

acceptance or default.   It does not matter whether the guaranty stipulates that the maker will pay, or that the guarantor will pay, nor whether the maker is solvent or not.    In either event, the undertaking is absolute, and the guarantor may pay the amount, or see that it is paid.   This is not the case of a guaranty of solvency or collectibility, which requires previous demand and suit.   *Klein* v. *Kern*, 94 Tenn., 34, 28 S. W., 295, and authorities there cited.

The only explanation of this unbusinesslike procedure on the part of complainant bank is that the firm of guarantors did a valuable business with the bank and that complainant would do anything to protect them.

The main proposition presented by counsel for defendants is that complainant is not a holder of said paper for value within the meaning of our negotiable instrument law.   It is said it is not shown that complainant has ever paid anything in money, or the equivalent, for said paper; but the cashier of the bank merely testifies that he gave said firm "credit for the amount at the First National Bank of Elgin."   It is said it is not shown that said credit was ever used by said indorsers, W. S., J. B. & B. Dunham.   The entire testimony on this subject is found in the deposition of A. C. Hawkins, cashier of the complainant, Elgin City Banking Company.   He tells of the purchase of said notes, ·together with sundry other notes, in one lot, from W. S. Dunham, of the firm of W. S., J. B. & B. Dunham, paying therefor the full amount of said notes, with accrued in-

terest to date of purchase, at said bank, in the usual course of business. This was the testimony of the witness on his direct examination, from which it appears that a *prima facie* case of a holder for value is made out; but, on cross-examination of the witness at a later date, he was asked, "Q. 4. Do you recall how you paid for them [referring to the notes]?" and he answered, "I gave them credit for the amount at the First National Bank of Elgin on the 18th day of July, 1904." It will be observed that the alleged credit was not given in the bank which purchased the notes (the complainant, Elgin City Banking Company), but at a different bank, namely, the First National Bank of Elgin, Ill.

The law seems to be settled that, when a bank simply discounts a note and credits the amount thereof on the indorser's account, without paying to him any value for it, it is not enough to constitute such bank a *prima facie* purchaser for value of the note. Selover, Neg. Inst. Laws, p. 217; 2 Amer. & Eng. Ency. of Law, 391, 392; *Warman* v. *First Nat. Bank*, 185 Ill., 60, 57 N. E., 6, 49 L. R. A., 412.

The reason is that the proceeds of the discount may be credited to the bank by making a change of entries on its own books. It is said, however, that this rule of law has no application where the credit to the seller of negotiable paper is given by the purchaser, not on its own books, but in a different bank. It is said the presumption must be, in such case, that the purchaser has paid money, surrendered securities, released an obligation, or

itself assumed an obligation in the other bank, in order to secure this credit. The record fails to show why payment of the notes was made in this manner, nor the precise nature of the transaction by which the complainant bank secured credit to the seller in the First National Bank of Elgin for the amount of these discounted notes.

It is well settled that a purchaser of commercial paper is a holder for value and in due course of trade, when he "has given for the note his money, goods, or credit, at the time of receiving it, or has on account of it sustained some loss or incurred some liability." *Nichol* v. *Bate,* 10 Yerg., 429; *Kimbro* v. *Lytle,* 10 Yerg., 417, 31 Am. Dec., 585; *Bank* v. *Johnston,* 105 Tenn., 521, 59 S. W., 131.

As already seen, by section 25 of our negotiable instrument law (Acts of 1899) it is provided: "Value is any consideration sufficient to support a simple contract." There is no trouble, therefore, in holding that, if the complainant bank had obtained credit in favor of the seller in a solvent bank for the amount of the discounted paper, that would be a sufficient consideration to constitute the purchaser a holder for value.

The difficulty presented arises out of the indefiniteness of the testimony. The witness was not asked by counsel on either side for an explanation of his statement, "I gave them credit for the amount at the First National Bank at Elgin." It does not appear from the record that this credit was ever used by W. S., J. B. & B. Dunham. It does not appear how the credit was given,

and the court cannot determine, from the unexplained statement of the witness, whether or not the credit was real and substantial. The burden of proof is on complainant to show, on these facts, that it was a holder for value.

The fraud that vitiated the original transaction was the conduct of the agent, Campbell, in representing to five of the purchasers that Beard, Hall, and Thurston had become equal partners in the purchase of the horse, when this agent had secretly arranged with these three parties to pay them a consideration to allow the use of their names as purchasers and to release them from the payment of their quota of the purchase money.

Affirmed.