THE BANK OF CONWAY, a Corporation, Respondent, v. B. H. STARY, and Dan Sutherland, Appellant.

(37 L.R.A. 1186, 200 N. W. 505.)

**Bills and notes — accommodation endorser before delivery not surety with right to require creditor to pursue other remedies.**

1. An accommodation endorser, who endorses a promissory note before delivery, under §§ 6913, 6948 and 6949, Comp. Laws, 1913, (§§ 29, 63 and 64 of the Uniform Negotiable Instruments Law) is not a surety within the provisions of chapter 85 of the Civil Code (§§ 6675 to 6689, Comp. Laws, 1913), so as to have the right, under § 6683 thereof, to require the creditor

---

Note.—(4) Relation between bank and general depositor, see 3 R. C. L. 519; 1 R. C. L. Supp. 840; 4 R. C. L. Supp. 190; 5 R. C. L. Supp. 177.

(5) Parol evidence as to liability of irregular endorser to payee, see notes in 4 A.L.R. 764; 11 A.L.R. 637; 22 A.L.R. 527; 35 A.L.R. 1120; 37 A.L.R. 1222; 3 R. C. L. 974; 1 R. C. L. Supp. 936; 4 R. C. L. Supp. 226; 5 R. C. L. Supp. 211.

to proceed against the principal or to pursue any other remedy in his power which the surety cannot himself pursue and which will lighten his burden, with resulting exoneration from liability if the creditor fails, refuses or neglects to sue the principal, or enforce payment by the principal in appropriate legal proceedings. Whether, and, if he is, under what circumstances and to what extent, an accommodation endorser or maker of a promissory note may be entitled to any of the rights and remedies of sureties under chapter 85, supra, is not decided because that question is not properly involved in this proceeding.

**Bills and notes — status of accommodation endorser that of endorser.**

2. The status of the accommodation endorser is fixed by the Negotiable Instruments Law as that of an endorser.

**Bills and notes — accommodation endorser held precluded by waiver in note to subsequently require creditor to proceed against principal.**

3. One who is an accommodation endorser of a note, and liable as such, in accordance with §§ 6914, 6948 and 6949, Comp. Laws, 1913, being §§ 29, 63 and 64 of the Uniform Negotiable Instruments Law, which contains in the body thereof the following stipulation: "the makers and endorsers each guarantee the payment of this note and waive demand, protest and notice of nonpayment, and consent to any extension of time of payment or renewal thereof without notice," is bound by this waiver, and, if a surety within the provisions of § 6683, Comp. Laws, 1913, permitting a surety to accelerate the movements of the creditor by notice and upon demand, he cannot afterwards, by giving notice, require the creditor to proceed against the principal debtor.

**Banks and banking — relation of bank and depositor that of debtor and creditor; statute giving bank lien on property in its hands held inapplicable to general deposit.**

4. The relation between a bank and a depositor is that of debtor and creditor merely; the bank is not a custodian of a deposit, but a debtor to the depositor in the amount thereof, Section 6868, Comp. Laws, 1913, (repealed in 1919) giving the bank a lien upon all property in its hands, has no application to a general deposit. Whether a bank may apply a deposit upon an indebtedness of the depositor, is not decided.

**Evidence — intent to be bound in capacity other than endorser as defined by statute cannot be shown by parol proof.**

5. Under § 6948, (§ 63 of the Negotiable Instruments Act) the intent to be bound in some capacity other than defined in §§ 6948 and 6949, (§§ 63 and 64 of the Negotiable Instruments Act) must be indicated in the endorsement and cannot be shown by parol proof. The statute fixes the status of the accommodation endorser.

Opinion filed August 18, 1924.

Ranks and Banking, 7 C. J. § 326 p. 642 n. 2; § 352 p. 655 n. 86, 87. Bills and Notes, 8 C. J. § 2 p. 32 n. 7, p. 33 n. 9; § 36 p. 45 n. 40; § 42 p. 48 n. 77; § 47 p. 50 n. 1; § 398 p. 253 n. 55; § 411 p. 263 n. 66; § 434 p. 278 n. 26, 30, p. 279 n. 33 New; § 563 p. 380 n. 71. Common Law, 12 C. J. § 6 p. 180 n. 53; § 11 p. 183 n. 73, 74. Evidence, 22 C. J. § 1642 p. 1231 n. 1; 23 C. J. § 1955 p. 137 n. 54.

Appeal from the District Court of Walsh County, North Dakota, *Burr, J.*

Affirmed.

*H. C. DePuy,* for appellant.

*Gray & Myers,* for respondent.

JOHNSON, J. This is an appeal from a judgment entered by the district court of Walsh County, against the defendant, Dan Sutherland. The other defendant, B. H. Stary, interposed no defense, and judgment was entered against him by default. Sutherland appeals.

The suit is upon a promissory note, the complaint being in the usual form. It is alleged that the defendant Sutherland wrote his name on the back of the note, before delivery thereof to the payee, for the purpose of securing the loan.

The defendant Sutherland answered, specifically admitting the corporate character of the plaintiff and the execution of the note by his codefendant Stary; otherwise, the answer denied generally the allegations of the complaint. At the trial, the paragraph containing the general denial was stricken out. The result is that the allegation of the complaint, as to the endorsement by appellant, stands admitted. The defendant alleged, by way of defense, that he received no consideration for endorsing the note, that it was endorsed for the accommodation of the maker, that, at the time he endorsed the note, the maker Stary was wholly solvent and was doing a profitable business and was fully able to pay the note; that thereafter, and while Stary was solvent, able to pay the note, engaged in a profitable business, and while the plaintiff had funds and collateral in its possession and opportunity to collect said note from the maker, the defendant demanded that plaintiff proceed against the maker and served notice that, unless such proceedings were taken, appellant would hold himself discharged; that the plaintiff did not proceed against the maker, but instead, and for a valuable con-

sideration, without appellant's consent, extended the time of payment. The answer further alleges that several times thereafter, and after the note was past due and payment thereof had been extended, and while the maker was solvent and was transacting business with the plaintiff and fully able to pay the note, and while the plaintiff had opportunity to collect the note from the maker, the appellant demanded that plaintiff take proceedings against the maker Stary, or this appellant would hold himself discharged. Then follow allegations that the plaintiff and respondent neglected to take proceedings against the maker; that the maker became and was, at the time of the trial, wholly insolvent; that collateral held by the plaintiff had become worthless and deposits withdrawn; and that the appellant herein had been prejudiced by the acts and omissions of the plaintiff as alleged in the answer to the full amount due on the note.

Some testimony and formal proofs were offered, tending to support the allegations of the answer. These were rejected by the court and error is predicated on such ruling. The plaintiff proved the execution of the note by the defendant Stary and the endorsement thereof in blank by the defendant Sutherland, introduced the note in evidence and rested. The note contained the following:

"The makers and endorsers each guarantee the payment of this note and waive demand, protest and notice of nonpayment, and consent to any extension of time of payment or renewal thereof without notice."

The defendant took the witness stand and some questions were asked with reference to the solvency of the defendant Stary, but the witness was not permitted to answer, the theory of the trial court being that the facts affirmatively alleged did not constitute a defense to plaintiff's cause of action.

In order to have a correct understanding of the situation, it is necessary to refer more specifically to the proceedings had in the trial court. The defendant, Sutherland, testified in his own behalf, in substance, as follows: That he endorsed the note in suit for the accommodation of the maker and received no consideration therefor, either from the payee or the maker of the note; that *after* the note matured, to wit: after the 15th day of November, 1917, the plaintiff bank, thru either an officer or employee, asked the defendant to pay the note or renew it, but that defendant at that time told the bank that he would not pay it or renew

it; that the maker was doing "lots of business" and "that if they did not *get it* from Stary (the maker) that I would not consider myself under obligation to them." It is to be noticed that the date of this conversation is not given, but it took place after the maturity of the note. Obviously, if this demand upon the defendant to pay the note was made, (as the inference must be from the testimony) before any binding extension had been given to the maker and the maker had defaulted in payment, the obligation of the endorser to pay the note had become absolute and such liability, it has been held, is not that of a surety. See Comp. Laws 1913, § 6969; Carnegie Trust Co. v. Kistler, 89 Misc. 404, 152 N. Y. Supp. 242. The defendant testified that in the fall of 1920 the bank again requested him to renew the note, and that he refused. He now contends that he was entitled to the rights of a surety as defined in chapter 85, Civil Code, Comp. Laws 1913, and more specifically §§ 6681, 6682 and 6683 thereof, and was exonerated by reason of the refusal or failure of the plaintiff to proceed against the principal upon demand.

When the witnesses had testified as above set forth, and offers of proof had been made and rejected, a colloquy took place between the court and counsel for both parties, at the conclusion of which counsel for the defendant struck from his answer the general denial and counsel for plaintiff moved for judgment on the pleadings. The trial judge, in granting the motion, said that he took into consideration the evidence already in the record, as well as the defensive matters alleged in the answer. This statement of the court seems to have been acquiesced in by both sides and, in fact, counsel for appellant, in his statement of the ultimate facts, sets out the demand made upon the defendant Sutherland for the payment or renewal of the note. This was testified to by Mr. Sutherland. The case, therefore, comes before this court upon the pleadings and the evidence before the trial court when the motion for judgment on the pleadings was granted.

Taking the most favorable view of the case from the standpoint of the defendant and appellant, the record shows that, after the note was due, at the time when plaintiff made its demand upon the defendant for payment, the latter countered with a demand that the plaintiff proceed against the principal debtor and then told plaintiff that if such proceedings were not taken, defendant would hold himself discharged.

The fundamental question, therefore, is whether an accommodation endorser, who endorses, before delivery, a promissory note containing the waivers and consent to extensions of time, incorporated in the note in suit, may relieve himself from liability thereon by notifying the creditor-payee to proceed against the principal debtor under the provisions of § 6683, Comp. Laws, 1913.

Section 6683 appears to be principally relied on by the appellant. That section reads as follows:

"A surety may require his creditors to proceed against the principal or to pursue any other remedy in his power, *which the surety cannot himself pursue* and which would lighten his burden; and if in such case the creditor neglects to do so, the surety is exonerated to the extent to which he is thereby prejudiced."

It is not necessary, in the view we take of this case, to discuss at great length the interesting question of the boundaries of the right given the surety by § 6683, supra. That question is not free from difficulty. The Oklahoma statutes defining the rights of sureties, including § 6683, supra, are taken from this state without change. In that state, the supreme court was held, under facts very similar to, in fact, scarcely distinguishable from the facts in the case at bar, that the surety cannot, by demand, compel the creditor to sue the principal maker before the former may require the surety to pay the note. The statutes cited in these cases, as to the remedies of the surety, are identical with ours, and § 4964 of the Oklahoma Statutes of 1910, is substantially identical —perhaps not quite so broad—as § 7407, Comp. Laws 1913, making it optional with the plaintiff to include in one action all persons severally liable on an instrument. Palmer v. Noe, 48 Okla. 450, 150 Pac. 462; National Bank v. Lowrey, 57 Okla. 304, 157 Pac. 103; Gregg v. Oklahoma State Bank, 72 Okla. 193, 179 Pac. 613. According to the Oklahoma rule, as applied in the cases cited, the contention of the appellant could probably not be sustained.

An accommodation endorser, who endorses a promissory note before delivery, under §§ 6914, 6948 and 6949, Comp. Laws 1913 (§§ 29, 63 and 64 of the Uniform Negotiable Instruments Act), is not a surety within the provisions of chapter 85 of the Civil Code (Comp. Laws 1913, §§ 6675 to 6689) so as to have the right, under § 6683 thereof, to require the creditor "to proceed against the principal or to pursue

any other remedy in his power which the surety cannot himself pursue and which will lighten his burden," with resulting exoneration from liability if the creditor fails, refuses or neglects to sue the principal, or enforce payment by the principal in appropriate legal proceedings. Whether, and, if he is, under what circumstances and to what extent, an accommodation endorser or maker of a promissory note may be entitled to any of the rights and remedies of sureties under chapter 85, supra, is not decided because that question is not properly involved in this proceeding.

In the absence of a statute to the contrary similar to § 4882, Rev. Codes 1899, the rule seems to have been well nigh universal, before the Negotiable Instruments Law, that an accommodation endorser did not stand in the relation of a surety to the maker so as to be within the provisions of statutes giving the surety the right to enforce remedies against the principal debtor or to require the creditor to proceed against the principal debtor for the protection of the surety. Ross v. Jones, 22 Wall. 576, 22 L. ed. 730; Gordon v. Southern Bank, 19 Ind. 192: Converse v. Cook, 25 Hun, 44; Gibson v. Parlin, 13 Neb. 292, 13 N. W. 405; Clark v. Barrett, 19 Mo. 39; Miller v. Mellier, 59 Mo. 388. But this was not the rule in North Dakota prior to the adoption of the Uniform Negotiable Instruments Act. See Revised Codes 1899, § 4882.

It is, of course, elementary that, in the absence of a statute, a general endorser is not a surety, nor is he entitled to the rights that belong to the surety relation.

Section 6914, Comp. Laws 1913, being § 29 of the Uniform Negotiable Instruments Law, provides that an accommodation endorser is liable to a holder for value notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party. The plaintiff in the case at bar is a holder for value under the Negotiable Instruments Law, and, in the absence of defenses, Sutherland would be liable as such endorser to the bank. Sections 6948 and 6949, being §§ 63 and 64 of the Negotiable Instruments Law, fix the status of the accommodation endorser and his liability as such to the payee and all subsequent parties. Without extending the discussion, we are unable to see anything in these sections or in any other part of the Negotiable Instruments Act that can be construed as an abrogation of

the general rule theretofore existing, in the absence of a statute to the contrary, with respect to the relation of the accommodation endorser to the principal maker of the note. It was not that of a surety, so as to bring him within the provisions of statutes similar to § 6683. The Negotiable Instruments Law does not expressly give the accommodation endorser rights as a surety in this respect which he did not formerly have. By repealing § 4882 Rev. Codes 1899, the inference is legitimate that the legislature intended to take from the accommodation endorser the rights of a surety as defined in § 6683, Comp. Laws 1913. Whether the act enlarges or restricts the grounds upon which a surety may be discharged is not here involved. See National Bank v. Lowrey, 57 Okla. 304, 157 Pac. 103; Graham v. Shephard, 136 Tenn. 418, 189 S. W. 867, Ann. Cas. 1918E, 804, where conflicting views upon this question are expressed.

We find the rule of § 6683 foreshadowed and broadly applied in Pain v. Packard, 13 Johns. 174, 7 Am. Dec. 369, and King v. Baldwin, 17 Johns. 384, 8 Am. Dec. 415. It is not necessary to discuss these cases. It is sufficient to say that they have been criticized in subsequent decisions of the highest courts of New York and of other states as unsound and as stating a rule which was an anomaly in the common law; see Warner v. Beardsley, 8 Wend. 199, 200; Bingham v. Mears, 4 N. D. 437, 27 L.R.A. 257, 61 N. W. 808; Huey v. Pinney, 5 Minn. 310, Gil. 247. Section 1372 of the Field Code codifies, though with limitations, the rule of these decisions in language identical with § 6683, Comp. Laws 1913, except that our legislature omitted the provisions in the Field Code requiring the surety to offer to indemnify the principal against loss, generally a prerequisite to obtaining this relief in courts of equity. Huey v. Pinney, supra, p. 253 [Gil.]. In the note to this section of the Field Code, it is said: "This seems on the whole to be the more reasonable rule, though the authorities do not fully sustain it." Our statute was adopted in 1877 as § 1681 of the Civil Code of the Territory of Dakota.

In New York, whence the rule of § 6683 is derived, the supreme court held, in Converse v. Cook, 25 Hun, 44 (1881), that an accommodation endorser was not within the rule of Pain v. Packard or King v. Baldwin, supra, and was not relieved from liability as such accommodation endorser, because the creditor, upon demand, had refused or

neglected to proceed against the principal debtor. In the case of Trimble v. Thorne, 16 Johns. 152, 8 Am. Dec. 302, the same justice who wrote the opinion in King v. Baldwin held that a regular endorser was not within the rule and had no right to compel the creditor to proceed against the principal debtor before enforcing the endorser's obligation under the instrument. This last case was decided in 1819. It would seem, therefore, that the New York courts, where this rule originated, have not been disposed to extend it or to apply it to any relation other than that of suretyship in the common law or technical sense.

The Uniform Negotiable Instruments Act was adopted in this state in 1899. Chapter 88 of the Civil Code of the Revised Codes of 1899 contained the prior law of negotiable instruments. Section 4882 (Field Code, § 1260) thereof expressly gave the accommodation endorser all the rights of a surety as defined in the chapter on Suretyship and provided that such endorser be exonerated in like manner. When the Uniform Negotiable Instruments Law was adopted this section was repealed. Other and different provisions took the place of this statute. It is now contended that the accommodation endorser, notwithstanding this repeal and the provisions of the Negotiable Instruments Law, particularly §§ 63 and 64 of that act, is entitled to all of the rights, privileges, and immunities of a surety at common law and under the statutes. It is too clear for argument, if this doctrine be sound, that the result will be to import into the Negotiable Instruments Act the law of forty-eight different jurisdictions defining the rights and liabilities of sureties, adding elements of uncertainty which, to a substantial extent, negative the desirable purpose of uniformity in the law of commercial paper. That may not be a conclusive reason why the doctrine should be rejected, but in view of the object sought to be attained and the desirability that the courts cast no obstructions in the way, the contention is entitled to serious consideration.

We do not propose to enter into a lengthy discussion as to the nature of the history of the development of the law merchant, on the one hand, and the law of suretyship on the other. The term "surety" is not known to the law merchant, but is a term of common-law origin. It is insisted that the term with all its incidents at common law must now be bodily carried over into the law of negotiable instruments and that the rights of the surety or the accommodation endorser, whose position

or contract is of course, in some particulars, similar to that of the common law surety, shall be measured according to the rules of the common law. It seems to the writer that the advocates of this doctrine overlook important historical facts. The term surety was unknown to the law merchant; the relation or status itself has no real analogy therein. The statute, § 196, provides that the rules of the law merchant, not of the common law, nor of local statutes governing the rights of sureties, shall govern in all matters not covered by the act. The law merchant is a system of law that does not rest exclusively on the institutions and local customs of any particular country, but consists of certain principles of equity and usages of trade which general convenience and a common sense of justice have established to regulate the dealings of merchants and mariners in *all the commercial countries of the civilized world*. 3 Kent, Com. 2; Brooklyn City & N. R. Co. v. National Bank, 102 U. S. 14, 31, 26 L. ed. 61, 68. Of this system we are required to take judicial notice. Comp. Laws 1913, §§ 7938–7952. "This lex mercatoria or common law of merchants is of more universal authority than the common law of England." 1 Randolph, Com. Paper, 1. The common-law courts, when they had ousted the jurisdiction of admiralty, as will be hereafter adverted to, decided "the causes of merchants by the general rules which obtain in all commercial countries; and that often, even in matters relating to domestic trade, as, for instance, with regard to the drawing, the acceptance, and the transfer of inland bills of exchange." In other words, the transactions of commerce were regulated by a law of their own and that was the law merchant "which all nations agree in and take notice of." 1 Bl. Com. 273.

It should be noted that the lex mercatoria was originally a separate body of law and, like equity and admiralty law, was administered in separate or special courts. See Jenks, History Eng. Law, pp. 40, 128. It was somewhat analogous to the Roman system known as jus gentium.

The lex mercatoria was not, like the common law, the custom of a place or territory; it was the recognized custom of merchants and traders who had business relations in all the countries of Europe, including England. The merchants class, and disputes among its members arising out of commercial transactions, were not subject to the common law. This practice grew out of the necessities of commerce and of trade. Merchants traveled from fair to fair and from place to place,

but in all places the same rules of law were administered and enforced in commercial litigation.

Later, the admiralty court widened its jurisdiction to embrace mercantile causes. During the sixteenth century this court declared the principles of the law merchant. Later, the common law judges began to encroach upon the field of admiralty jurisdiction over commercial transactions and, as a result of numerous causes unnecessary to discuss, the jurisdiction of admiralty was gradually reduced and the jurisdiction of the common law courts increased over this class of cases. As administered by the King's Courts, the rules of the law merchant nevertheless remained a body of law which were applied to *particular classes of transactions* rather than to a particular class of men. The law merchant thus gradually became a part of the legal system of England. See 2 Street, Foundations of Legal Liability, p. 331 ff. It is true that the process was necessarily marked by mutual adaptation and substantial modification of both systems, that is, the law merchant and the common law. It is nevertheless inaccurate to say that the law merchant lost its identity entirely and became wholly assimilated with the common law when its administration was assumed by the King's Courts. Though its principles were adopted into the common law by Lord Mansfield, the law merchant still remained a body of rules applicable to a certain class of transactions, and international in character. See Jenks, History Eng. Law, pp. 239, 303. It seems to the writer to be at least a questionable use of terms to speak of the common law as the law of negotiable instruments when the law merchant is intended. The law merchant, in so far as its fundamental principles are concerned, remained essentially a separate system of law. It is no more accurate, as a generalization, to say that where the law merchant is silent it is subject to the rules of the common law than it would be to say that where the common law is silent it is subject to the principles and rules of the law merchant. The law merchant is, in fact, "an independent parallel system of law, like equity or admiralty." Bigelow, Bills, Notes & Checks, p. 5. The King's Courts administered not local custom, nor even the custom of the realm, but rules applied in commercial causes in all countries.

It should also be noted that interference by the courts in behalf of the surety as against the creditor for the purpose of accelerating the

movements of the latter, or of compelling him to take action for the protection of the surety's interests, is of equitable origin. Later, the rules of equity were recognized and given effect at law. Their origin and development, however, were entirely distinct and separate from the rules of the law merchant. The rule that a court of equity would under some circumstances aid the surety in order to protect his interests by compelling action or nonaction by the creditor, is of comparatively recent origin. In any event, it has no connection, whatever, with the origin, development, or application of the rules of the law merchant.

Our legislature has distinctly recognized the common law as applicable in certain cases in the absence of statute. See § 7936, subsec. 41; § 11,179; and §§ 4329–4331; Comp. Laws 1913. See also Pratt v. Pratt, 29 N. D. 531, 536, 151 N. W. 294. The Negotiable Instruments Law, however, expressly adopts the Law Merchant, not the rules of the common law, as to matters not covered therein, and this court is required to take judicial notice thereof. Comp. Laws 1913, §§ 7938–7952. This is a distinct legislative recognition of the historical fact that the law merchant has a history and had a development distinct and essentially different from that of the common law; and of the further fact that although ultimately the administration of the rules of the law merchant was assumed by the King's Courts, its fundamental principles remained substantially intact.

It seems to the writer of this opinion that it was the intention of the framers of the Negotiable Instruments Law to define the status of the accommodation endorser without reference to the rights of the surety at common law, by giving him the right to indicate upon the instrument, in appropriate words, if he desired to be bound in the capacity of and entitled to the rights and privileges of a surety at common law or under the statutes of the jurisdiction governing the contract between the parties.

It is next insisted that alleged extensions of time operated to exonerate the endorser from liability. It is a sufficient and complete answer to this argument to point out that the note contained an express consent to "any extension of time." When the endorser consented to "any extension of time," he consented in law "that any one of an indefinite number of extensions" might be made. Winnebago County State Bank

v. Hustel, 119 Iowa, 115, 93 N. W. 70; Gregg v. Oklahoma State Bank, 72 Okla. 193, 179 Pac. 613. See also Bonart v. Rabito, 141 La. 970, 76 So. 166. Sutherland is in no position to object because the creditor did that which he expressly and without restriction authorized him to do.

One who is an accommodation endorser of a note, and liable as such, in accordance with §§ 6914, 6948 and 6949, Comp. Laws 1913, being §§ 29, 63 and 64 of the Uniform Negotiable Instruments Law, which contains in the body thereof the following stipulation: "the makers and endorsers each guarantee the payment of this note and waive demand, protest and notice of nonpayment, and consent to any extension of time of payment or renewal thereof without notice," is bound by this waiver, and, if a surety within the provisions of § 6683, Comp. Laws 1913, permitting a surety to accelerate the movements of the creditor by notice and upon demand, he cannot afterwards, by giving notice, require the creditor to proceed against the principal debtor.

The appellant, Sutherland, when he endorsed the note, became bound by the stipulation in the body of the instrument heretofore quoted. All of the waivers therein contained are binding upon him to the same effect as if he had signed the instrument as principal maker. Comp. Laws 1913, § 6995; Archenhold Co. v. Smith, — Tex. Civ. App. —, 218 S. W. 808; Scott v. Smith, 35 Idaho, 388, 206 Pac. 812; Phillips v. Dippo, 93 Iowa, 35, 57 Am. St. Rep. 254, 61 N. W. 216. Appellant, in legal effect, says to the holder of the note that any extensions of time may be made, without notice to him, which, in the judgment and discretion of the holder or creditor, may be expedient or necessary under the circumstances. This language is broad enough to include a waiver of the statutory right of the surety to accelerate the movements of the creditor by notice, as provided in § 6683, Comp. Laws 1913. Manifestly, the express agreement that the time of payment may be extended an indefinite number of times without notice is entirely inconsistent with the contention that the endorser, who has expressly agreed that such extensions may be made, may nevertheless, by a demand after the note is due, destroy the effect of such agreement, and, in an important and substantial particular, modify the contract without the assent of the other party to it and compel the creditor to institute proceedings upon the note. Owensboro Sav. Bank & T. Co. v.

Haynes, 143 Ky. 534, 136 S. W. 1004; Archenhold v. Smith, — Tex. Civ. App. —, 218 S. W. 808; Armour Fertilizer Works v. Bond, 139 Ga. 246, 77 S. E. 22.

One other matter remains to be considered. Appellant alleges in his answer as follows:

"That thereafter and after the maturity of said note, and while the same was due and payable, and while said B. H. Stary was wholly solvent and doing. a large and profitable business, and was transacting. business with the plaintiff, and while he was fully able to pay said note, and the plaintiff from time to time had funds and collateral of and ample opportunity to collect said note from the said B. H. Stary, this defendant demanded of the plaintiff that he proceed against the said B. H. Stary, etc."

These allegations must be accepted as true. We shall first discuss the question as to the duty of the creditor to realize on the collateral. Must the creditor take steps to realize on the collateral security in his possession before enforcing the obligation of the accommodation endorser or the surety? This question seems to have been answered in the negative in this state, at least as far as the surety is concerned. In Bingham v. Mears, 4 N. D. 437, 27 L.R.A. 257, 61 N. W. 808, the court says:

"On the same principle the surety cannot insist that the creditor must first essay to collect his claim out of the collaterals the principal debtor has given him except in the case mentioned in § 4310. This statute is inapplicable in this action."

Section 4310, referred to, in § 6688, Comp. Laws 1913, and has no application to the facts in the case at bar. See Brandt, Suretyship & Guaranty, § 260. The rule is reiterated by this court in William Deering & Co. v. Russell, 5 N. D. 319, 326, 65 N. W. 691. Furthermore, and this fact is controlling on this appeal, whether appellant be endorser or surety, the testimony in the record on this subject is to the effect that the bank did not take collateral because "it was not necessary." This testimony was not contradicted and appellant did not offer to prove the contrary. We hold, therefore, that no facts appear in the record or in the offers of proof which gave rise to a duty on the part of the creditor to realize on collateral before proceeding against

the appellant, whether we assume appellant's status to be that of a technical surety or regard him as an accommodation endorser.

Construing the portion of appellant's answer above quoted as an allegation that the respondent had in its possession, as a deposit to the credit of the principal debtor, an amount sufficient to pay the note in suit or a portion thereof, we are constrained to hold that the court did not err in granting the motion for judgment upon the answer and the evidence. This allegation is not supplemented or made more specific by an offer of proof. This court has held, on at least two different occasions, that the relation between a bank and a depositor "is that of debtor and creditor merely;" that the bank is not a custodian of a deposit, but a debtor to the depositor in the amount thereof. Shuman v. Citizens' State Bank, 27 N. D. 590, 605, L.R.A. 1915A, 728, 147 N. W. 388; Citizens' State Bank v. Iverson, 30 N. D. 497, 512, 153 N. W. 339. This court also held that § 6868, Comp. Laws 1913, giving the bank a lien upon all property in its hands, had no application to a general deposit. Shuman v. Citizens State Bank, supra. (This section was repealed by chap. 176, Session Laws 1919.) The right of a bank, therefore, to apply a deposit upon an indebtedness owing by the depositor to the bank is not in the nature of a lien but "is rather a right of set off or application of payments." 7 C. J. 655. There is grave doubt whether, in any case, the duty exists to apply the deposit on the note. First International Bank v. Beiseker, 43 N. D. 446, 175 N. W. 637. It is not necessary to decide that question now. The undisputed testimony shows that such deposits as the principal had in the bank were special deposits—checks had been drawn and approved against the deposit—and could not be applied on the note. The allegations of the answer are somewhat indefinite; and the appellant did not offer proof to contradict this testimony. It must be taken as an established fact in the case that such deposits could not, on any theory, be applied on the note.

If the appellant be, in effect, seeking to prove that he was liable in some capacity other than that of an endorser, he must also fail. Under § 6948 (§ 63 of the Negotiable Instruments Act) the intent to be bound in some capacity other than defined in §§ 6948 and 6949, (§§ 63 and 64 of the Negotiable Instruments Act) must be indicated in the endorsement and cannot be shown by parol proof. The statute fixes the

status of the accommodation endorser. First Nat. Bank v. Bickel, 143 Ky. 754, 137 S. W. 790; Lyons Lumber Co. v. Stewart, 147 Ky. 653, 145 S. W. 376; Overland Auto Co. v. Winters, — Mo. App. —, 180 S. W. 561; Lightner v. Roach, 126 Md. 474, 95 Atl. 62; Mechanic v. Elgie Iron Works, 98 Misc. 620, 163 N. Y. Supp. 97; Baumeister v. Kuntz, 53 Fla. 340, 42 So. 886; Porter v. Moles, 151 Iowa, 279, 131 N. W. 23; Neosho Mill. Co. v. Farmers Co.-op. Warehouse Stock Co. 130 La. 949, 58 So. 825; Ensign v. Fogg, 177 Mich. 317, 143 N. W. 82; Meyers Co. v. Battle, 170 N. C. 168, 86 S. E. 1034; Rockfield v. First Nat. Bank, 77 Ohio St. 311, 327, 14 L.R.A.(N.S.) 842, 83 N. E. 392; Thompson v. Curry, 79 W. Va. 771, 91 S. E. 801; Murray v. Third Nat. Bank, 148 C. C. A. 247, 234 Fed. 485.

A contrary rule, namely, that §§ 63 and 64 merely create a presumption and that the real contract may be shown by parol or other evidence seems to have been applied in Mercantile Bank v. Busby, 120 Tenn. 652, 113 S. W. 390, and Kohn v. Consolidated Butter & Egg Co. 30 Misc. 725, 63 N. Y. Supp. 265. Prof. Brannan, in his comprehensive work, Negotiable Instruments Law, Annotated, 3d ed. 1921, p. 242, thinks that these decisions are "erroneous and to be regretted."

Judgment is affirmed with costs.

NUESSLE, J., concurs in the result.

BRONSON, Ch. J. (concurring). Plaintiff bank is the holder and payee of the note involved; defendant Stary is the maker thereof. Defendant Sutherland is an accommodation endorser in blank of the note before delivery. The note on its face bears the printed words,—"The makers and endorsers each guarantee the payment of this note and waive demand, protest, and notice of nonpayment, and consent to any extension of time of payment or renewal thereof without notice." Defendant Stary did not put in a defense and is in default. The defense of defendant Sutherland is that after the maturity of the note and while defendant Stary was wholly solvent defendant Sutherland demanded of the plaintiff that it proceed to collect the note against said defendant Stary; that plaintiff neglected and refused to proceed to collect from said defendant Stary and that by reason thereof defendant Sutherland has been wholly discharged from his obligation on the note. During

the course of the trial various efforts and offers made by defendant Sutherland to establish his defense were refused by the trial court. Thereupon, upon the suggestion and consent of counsel, the trial court entertained a motion for judgment upon the pleadings and granted the same, taking into consideration also the evidence introduced. It is the contention of defendant Sutherland upon this appeal that he, as endorser upon the note, is entitled to the privileges of §§ 6675 to 6689, Comp. Laws 1913, relating to sureties, and particularly § 6683 which provides that a surety may require his creditor to proceed against the principal or to pursue any other remedy in his power which the surety can not himself pursue and which would lighten his burden; and if in such case the creditor neglects to do so, the surety is exonerated to the extent to which he is thereby prejudiced. Defendant's assertion is that by reason of these statutory provisions his answer set forth a defense of exoneration.

The contract of endorsement made by defendant is governed by the provisions of the Uniform Negotiable Instruments Act adopted without change by this state in 1899. Comp. Laws 1913, §§ 6886–7010; Laws 1899, chap. 113.

The question presented, therefore, is whether an accommodation endorser, governed and bound by the provisions of this Uniform Act, is entitled to exoneration as a surety by reason of proceedings had, under statutory provisions relating to sureties, and, particularly, § 6683, Comp. Laws 1913.

Fundamental considerations are first involved concerning the purposes of such Uniform Act, as adopted without change in this jurisdiction, and concerning its status in connection with the cognate law upon principles of uniformity pursuant to the legislative purpose involved in its adoption.

It is now well known, as revealed by a host of authorities, that the legislative purpose in adopting this Uniform Act in the various states was to harmonize the law and to establish uniformity therein throughout the states of the Union upon the subject of negotiable instruments. See 5 Thompson Co. Uniform Laws, Anno. p. 8. In subserving this fundamental purpose and in promoting the plan of legislative uniformity among the states upon the subject matter, this Uniform Act has generally been considered by the courts as an act furnishing within

itself a guide for the determination of all questions relating to negotiable instruments: That in giving consideration to its provisions it is unnecessary to make strained constructions in order to harmonize earlier statutes or judicial decisions. In effect, the Uniform Act is a codification of the law relating to negotiable instruments. In consequence, the Uniform Act must be treated and considered as a corporate body of law controlling all cases to which it is applicable. See Columbian Bkg. Co. v. Bowen, 134 Wis. 218, 114 N. W. 451; National City Bank v. National Bank, 300 Ill. 103, 22 A.L.R. 1153, 132 N. E. 832; First Nat. Bank v. Miller, 139 Wis. 126, 131 Am. St. Rep. 1040, 120 N. W. 820; Elsey v. People's Bank, 168 Ky. 701, 182 S. W. 873; See 5 Thompson Co. Uniform Laws Anno. p. 11.

This Uniform Act is now in force in every state of our Union excepting one; it is in force in some of our Territories; it has been adopted, in word or substance, in many foreign countries; it has received International recognition. The high juristic service performed by the National Conference of Commissioners on Uniform State Laws in drafting this Uniform Act and in aiding the legislative adoption of the principle of uniformity as applied to negotiable instruments has received practically universal recognition.

Accordingly, if the underlying principle of uniformity involved so universally recognized by legislative enactment and legislative purpose, may be conserved, it must be by judicial interpretation and construction consonant with principles of uniformity expressly recognized by the uniform legislative enactments. Otherwise, judicial interpretation and construction may destroy effectively the very purposes for which the Uniform Act has been adopted.

Consistent with the general thought and purpose, above expressed, this court has said, concerning this Uniform Act, that "It is indeed quite important that the interpretation by the courts of the various states of the provisions of the Negotiable Instruments Act shall be as uniform as is now the act itself." First Nat. Bank v. Meyer, 30 N. D. 388, 397, 152 N. W. 657; that "The Negotiable Instruments Act was adopted by the different states to secure uniformity on the important subjects covered by the act. This being so, not only should the rule of stare decisis apply with full force but great weight should be given to the harmonious decisions of other states construing provisions of the

act. Scandinavian American Bank v. Westby, 41 N. D. 276, 295, 172 N. W. 665.

In the light of these considerations, it is obvious that if the provisions of this uniform act concerning negotiable instruments are to be interpreted and construed in the light of extraneous statutory provisions of the cognate law existing in the various states, then the very principle of uniformity sought to be attained will be obviated by diverse constructions and interpretations of the various states dependent upon the cognate law considered and made applicable to the language and provisions of the uniform act itself. Obviously, such course of procedure, if followed by the courts, will destroy the legislative purpose involved in the adoption of the act and will simply serve to establish a trap for the unwary by having an act, uniform in language but diverse in application. Upon such considerations, the question may now be approached concerning the right of an accommodation endorser to rely upon a statutory provision concerning sureties merely because his relation as accommodation endorser involves a consideration of the law of suretyship.

In the instant case the defendant, as an accommodation endorser, is bound by the provisions of the Uniform Negotiable Instruments Act. He does not seek to assert nor to prove any other contract existing with the plaintiff, the payee, other than such as the Negotiable Instruments Act has created. Accordingly, the defendant, by reason of his position as an accommodation endorser, seeks to read into the Negotiable Instruments Act the statutory provisions of law relating to sureties, upon the ground and for the reason that his position, under the pleadings and the evidence, is that of a surety.

Under the Negotiable Instruments Act the engagement of the defendant as endorser was to pay this note upon due presentment and after due notice of dishonor. Uniform Negotiable Instruments Act, § 66. This was a primary and independent obligation. The endorsement made by defendant was a general endorsement without restriction, condition or qualification. Defendant, by placing his signature upon the back of the note, without clearly indicating by appropriate words his intention to be bound in some other capacity, is deemed to be an endorser. Uniform Negotiable Instruments Act, § 63. The accommodation character of his endorsement did not change his obligation as an endorser to a holder for value. Uniform Negotiable Instruments Act,

51 N. D.—27.

§ 29. By endorsing his name in blank on the back of the note defendant assumed the stipulations contained in the body of the note. Thus he guaranteed the payment of the note, waived presentment and notice of dishonor, and consented to any extensions of time or renewal thereof without notice. Phillips v. Dippo, 93 Iowa 35, 57 Am. St. Rep. 254, 61 N. W. 216; Mooers v. Stalker, 194 Iowa, 1354, 191 N. W. 175; Scott v. Smith, 35 Idaho, 388, 206 Pac. 812; Owensboro Sav. Bank v. Haynes, 143 Ky. 534, 136 S. W. 1004; 5 Thompson Co. Uniform Laws Anno. p. 396. See Farmers & M. State Bank v. Behrens Mfg. Co. 50 N. D. 850, 198 N. W. 467. As endorser defendant, under the terms of the uniform act, was entitled to be released from his obligation only as therein prescribed. Uniform Negotiable Instruments Act, §§ 119 and 120 (Comp. Laws, §§ 7004, 7005). Defendant does not seek release under these provisions but under foreign statutory provisions applicable to sureties.

It is clear that within the terms of the Negotiable Instruments Act defendant's position on the back of this note was that of an endorser; not that of a guarantor or of a surety. This position was governed by the uniform law applicable to endorsers. The fact that he assumed the engagement of a guarantor, as contained in the body of the note, did not restrict, qualify or condition his liability as endorser upon the back of the note. Jones County Trust & Sav. Bank v. Kurt, 192 Iowa, 965, 182 N. W. 414; Elgin City Bkg. Co. v. Hall, 119 Tenn. 548, 108 S. W. 1068; Thompson Co. Uniform Laws Anno. p. 318.

Under the plain language of the Negotiable Instruments Act defendant's signature in blank upon the back of the note created for him the engagement of a general endorser. As such, pursuant to the terms of the act, he was not entitled to affect or release this engagement to pay the note by requiring the payee to proceed against the maker and upon the payee's neglect so to do, to be exonerated concerning such engagement, to the extent of the prejudice resulting. Such an engagement can be created for the defendant as an endorser only by reading into the Negotiable Instruments Act the statutory provision applicable to sureties and guarantors and disregarding his obligation as endorser. I am clearly of the opinion, for the reasons stated, that the defendant Sutherland was not entitled to rely upon or to invoke the statutory

provisions relating to sureties in order thereby to release and discharge his contract as endorser. The judgment should be affirmed.

CHRISTIANSON, J. (concurring). A determinative question in this case is: Is an accommodation indorser entitled to claim the rights of a surety? If that question is answered in the negative then the judgment appealed from must be affirmed. The answer to the question stated must be found in the statutes of this state. For, as stated by Mr. Justice Birdzell, in his dissenting opinion: "The questions involved would not be at all difficult of solution if the statutory law were all placed to one side. The defendant, Stary, having undertaken as maker of the note to pay, and the defendant Sutherland likewise having undertaken as indorser to pay and having broken his promise would, of course, be liable without qualifications aside from the statutes."

The Uniform Negotiable Instruments Law was adopted in this state in 1899, and since July 1, 1899 has been the law of this state. Prior to the adoption of the Uniform Negotiable Instruments Law there existed in this state quite an extended body of statutory law dealing with the subject of negotiable instruments. Under the law in force at the time of the adoption of the Uniform Negotiable Instruments Law it was expressly provided: "One who indorses a negotiable instrument at the request and for the accommodation of another party to the instrument has all the rights of a surety as defined by the chapter on suretyship and is exonerated in like manner in respect to every one having notice of the facts, except that he is not entitled to contribution from subsequent indorsers." Rev. Codes 1899, § 4882.

This provision was not, nor was any similar provision, embodied in the Negotiable Instruments Law adopted in 1899. But the Negotiable Instruments Law enacted in 1899 contained no repealing clause; and, this being so, it has been suggested that § 4882, Revised Codes 1899 was not repealed and remains in force. If that section remains in force then, of course, an accommodation indorser has all the rights of a surety as therein provided. Hence, the question is presented whether this section was repealed or superseded by the provisions of the Uniform Negotiable Instruments Law. In my opinion there can be but one answer to that question. The nature and purpose of the Uniform Negotiable Instruments Law are too well known to require

extended discussion. There can, I think, be no question but that the enactment was intended to supersede all then existing statutory enactments relating to the subject covered by the act. In fact it purports to be so, for, it provides: "In any case not provided for in this act the rules of the law merchant shall govern." Negotiable Instruments Law § 196, Comp. Laws, 1913, § 7080. So far as I am aware, no one has ever heretofore questioned that the legislature intended that Uniform Negotiable Instruments Law should supersede all then existing statutes upon that subject. That such was the legislative intent has been recognized in every subsequent general compilation of the laws of this state. The same legislature which enacted the Uniform Negotiable Instruments Law also provided for the codification of all the laws of this state and the publication thereof as the "Revised Codes of 1899," under the general supervision of the Secretary of State. See chapter 123, Laws 1899. The statutes of this state were so compiled and published, and later, in conformity with the provisions of the Act (Laws 1899, § 5, chap. 123), proclaimed by the Governor of this state to be in full force and effect as the laws of this state.

In the preface to the Revised Codes of 1899 the secretary of state said: "In 1899 an entirely new law was enacted on the subject of negotiable instruments, which provided however, that the same should not affect instruments executed before the date of the taking effect of the new law (July 1, 1899). This necessitated the printing of the old law upon that subject as the same appears in the Codes of 1895, and also the printing of the new law enacted in 1899. It was found impracticable to incorporate in the index, under the head of negotiable instruments, references to both the old and new law and comprising the sections upon that subject of the code of 1895, and for that reason an independent index has been incorporated upon that subject, and to avoid confusion the new law has been printed at the end of the civil code and is referred to in the index by sections and pages."

In the Revised Codes of 1899 there was inserted under the chapter containing the old negotiable instruments law, i. e., the law in force in this state prior to the adoption of the Uniform Act, the following note: "The law of 1899 on negotiable instruments being Chapter 100 and inserted in the end of the civil code governs as to all negotiable instruments executed after July 1, 1899." And at the beginning of

the Uniform Negotiable Instruments Act this note: "Governs as to all Negotiable Instruments executed on and after July 1899."

In 1905 there was a general revision and compilation of all the statutes of this state, under legislative authority. See Revised Codes 1905. In 1913 there was another similar revision and compilation. See, Compiled Laws 1913. In both the Revised Codes of 1905, and the Compiled Laws of 1913 only the provisions of the Negotiable Instruments Law adopted in 1899 were retained, and all provisions of the former negotiable instruments law were eliminated. No one has ever asserted that any error was committed in this regard. And it seems to me there can be no doubt but that the Negotiable Instruments Law adopted in 1899 was intended to, and did, supersede in every particular the negotiable instruments law in force at the time the latter enactment was adopted. For, as was well said, by the supreme court of Massachusetts, in Bartlet v. King, 12 Mass. 545, 7 Am. Dec. 99: "A subsequent statute revising the whole subject-matter of a former one, and evidently intended as a substitute for it, although it contains no express words to that effect, must on principles of law, as well as in reason and common sense, operate to repeal the former."

And Sutherland (1 Lewis's Sutherland, Stat. Constr. 2d ed. pp. 515, 517) says: "Though a subsequent statute be not repugnant in all its provisions to a former, yet if it was clearly intended to prescribe the only rule which should govern, it repeals the former statute. Without express words of a repeal a previous statute will be held to be modified by a subsequent one, if the latter was plainly intended to cover the subject embraced by both, and to prescribe the only rules in respect to that subject that are to govern. Where a provision is amended by the form, 'to read as follows,' the intention is manifest to make the provision following a substitute for the old provision and to operate exclusively in its place. Does a revision import that it shall displace the last previous form; that it is evidently intended as a substitute for it; that it is intended to prescribe the only rule to govern? In other words, will a revision repeal by implication previous statutes on the same subject, though there be no repugnance? The authorities seem to answer emphatically, Yes. The reasonable inference from a revision is that the legislature cannot be supposed to have intended

that there should be two distinct enactments embracing the same sub-ject-matter in force at the same time, and that the new statute, being the most recent expression of the legislative will, must be deemed a substitute for previous enactments, and the only one which is to be regarded as having the force of law." See also 26 Am. & Eng. Enc. Law, p. 733.

The question next presented is whether, under the Negotiable In-struments Law now in force in this state, an accommodation indorser is entitled to the rights of a surety as defined by the chapter on surety-ship. As indicated in the other opinions filed in this case, there is a conflict in the authorities upon the question whether an accommoda-tion party is entitled to invoke the laws relating to suretyship, and claim exoneration by virtue thereof.

One of the courts that has taken the position that, under the Negotia-ble Instruments Law, an accommodation party may not invoke the surety doctrine as a defense is the supreme judicial court of Massachu-setts. In Union Trust Co. v. McGinty, 212 Mass. 205, 98 N. E. 679, Ann. Cas. 1913C, 525, it gave the following reasons for so holding: "Before the enactment of the negotiable instruments act (Stat. 1898, chap. 533, Rev. Laws, Chap. 73, §§ 18–212) one who made a promis-sory note for the accommodation of another was as between the parties a surety. The holder, who had knowledge of the true relation of the parties, was bound to act toward such accommodation maker as toward a surety in order to preserve his rights against him. Under such cir-cumstances an extension of time to the person ultimately liable, with-out the consent of the surety, that is the accommodation maker, re-leased the latter. Guild v. Butler, 127 Mass. 386, and cases cited at 389; Jennings v. Moore, 189 Mass. 197, 75 N. E. 214. The precise point is whether this rule of law has been changed by the negotiable instruments act.

"It is matter of common knowledge that the negotiable instruments act was drafted for the purpose of codifying the law upon the subject of negotiable instruments and making it uniform throughout the coun-try through adoption by the legislatures of the several States and by the Congress of the United States. The design was to obliterate State lines as to the law governing instrumentalities so vital to the conduct of interstate commerce as promissory notes and bills of exchange, to re-

move the confusion or uncertainty which might arise from conflict of statutes or judicial decisions amongst the several states, and to make plain, certain and general the controlling rules of law. Diversity was to be moulded into uniformity. This act in substance has been adopted by many States. While it does not cover the whole field of negotiable instruments law, it is decisive as to all matters comprehended within its terms. It ought to be interpreted in such a way as to give effect to the beneficent design of the legislature in passing an act for the promotion of harmony upon an important branch of the law. Simplicity and clearness are ends especially to be sought. The language of the act is to be construed with reference to the object to be attained. Its words are to be given their natural and common meaning, and the prevailing principles of statutory interpretation are to be employed. Care should be taken to adhere as closely as possible to the obvious meaning of the act, without resort to that which had theretofore been the law of this Commonwealth, unless necessary to dissolve obscurity or doubt, especially in instances where there was a difference in the law in the different States.

"Approaching the act from this point of view, it is apparent that no relation of principal and surety is established or contemplated by any of its sections. It determines the liability of the various parties to the negotiable instrument on the basis of that which is written on the paper. The obligation of all makers, whether for accommodation or otherwise, is to pay to the holder for value according to the terms of the bill or note. Their obligation is primary and absolute. Sections 77, 208. The act makes no provision for the proof of another and different relation than that expressly undertaken and defined by the tenor of the instrument signed. The fact that one is an accommodation maker gives rise to a duty no less or greater or different to the holder for value than that imposed upon a maker who received value. This is expressly provided by the act, even though such holder knew at the time of making that the maker was an accommodation maker. Section 46. The act further provides in definite terms that the instrument and hence one primarily liable is discharged in one of five different ways (§ 136), that is, by payment by the principal debtor, or by the party accommodated, by cancellation, by any other act which would discharge a simple contract, and by the principal debtor becoming the owner at

or after maturity. There is no mention here of a discharge of an accommodation party by extension of time. But among the ways in which a party secondarily liable may be discharged is (§ 137) an agreement by the holder to extend the time of payment or to postpone his right to enforce the instrument 'unless made with the assent of the party secondarily liable or unless the right of recourse against such party is expressly reserved.' Whatever force might attach to the enumeration of ways in which the instrument and consequently parties primarily liable might be discharged, if this provision stood alone, the inference arising from the omission of extension of time from such enumeration and its inclusion among the ways in which persons secondarily liable may be discharged, is almost irresistible that the legislature did not intend that persons primarily liable should be discharged in that manner. These two sections standing side by side, both dealing with the subject of discharge of liabilities of parties, the one mentioning, the other not mentioning, extension of time by the holder as a means of working discharge of liability, cannot be treated as accidental or without significance. It is strong proof of a legislative purpose to change the pre-existing law of the commonwealth. These considerations outweigh the argument adduced from the fact that the 'instrument' rather than 'parties primarily liable' is the language used in § 136 and from the phrase of Clause 4, to the effect that the instrument may be discharged 'by any other act which will discharge a simple contract.' The act establishes a liability on the part of an accommodation maker, which is not affected by an extension of time given by the holder to any other party to the note, even though as between such party and the accommodation maker a different relation may subsist in fact from that appearing on the face of the paper. The result is to render somewhat more rigid the rights of the parties as set forth in the written instrument, and so far as the holder is concerned to establish liability to him upon a firm basis, not easily shaken by parol evidence."

The reasoning of the Massachusetts court has even more force as applied to the adoption of the Negotiable Instruments Law in this state; for, here there existed a specific statute (Rev. Codes 1899, § 4882) which provided that an accommodation indorser was entitled to "all the rights of a surety as defined by the chapter on suretyship and

is exonerated in like manner in respect to every one having notice of the facts, except that he is not entitled to contribution from subsequent indorsers." When the legislators of this state in 1899 decided to adopt a new law dealing with negotiable instruments, they knew that there was then in force, as a part of the then existing negotiable instruments law, a specific provision conferring upon an accommodation indorser all the rights of a surety, and making the provisions of the suretyship statute applicable to such indorser, yet they did not retain this provision or embody one of similar import in the law they adopted.

The question as to whether the statutory provisions relating to suretyship inure to the benefit of an accommodation party, and may be invoked by him as a defense, have been considered by this court, to some extent, in the following cases: Northern State Bank v. Bellamy, 19 N. D. 509, 31 L.R.A.(N.S.) 149, 125 N. W. 888; First Nat. Bank v. Meyer, 30 N. D. 288, 152 N. W. 657; Scandinavian American Bank v. Westby, 41 N. D. 276, 172 N. W. 665.

In Northern State Bank v. Bellamy, 19 N. D. 509, this court had occasion to consider the respective rights of a surety and of a guarantor under the Negotiable Instruments Law. The defendant in that case had placed his name upon the back of the note in suit, with the following words immediately above his signature: "For value received, I hereby guarantee the payment of the within note, and hereby waive presentment, demand, protest and notice of protest." The defendant pleaded as a defense that by extension of time to the principal debtor, he (defendant) was relieved from liability. "The trial court held that appellant (defendant) was in law a surety, and as such primarily liable upon the note sued upon, and was therefore not released from liability by the extension of time allowed." 19 N. D. 511. This court held that the defendant was a guarantor, and that the trial court was in error in holding him to be a surety. In the opinion in that case this court said:

"Under the law in reference to negotiable instruments in force prior to the year 1899, it is conceded by counsel for respondent that the act of plaintiff in extending the time of payment to the principal debtor without the knowledge or consent of appellant exonerated him from liability. Rev. Codes 1905, § 6092; Foster County State Bank v. Hester, 18 N. D. 135, 119 N. W. 1044. In 1899 a new law upon

the subject of negotiable instruments was enacted by the legislature, which, as respondent contends, contains certain provisions that alter and supersede the rules in force prior to that time governing the relation of guarantor. Section 6422, Rev. Codes 1905, which is a part of this new enactment, is as follows: 'A person secondarily liable upon the instrument is discharged: . . . By any agreement binding upon the holder to extend the time of payment, or to postpone the holder's right to enforce the instrument, unless made with the assent of the party secondarily liable, or unless the right of recourse against such party is expressly reserved.' *As this section provides in express terms the means by which a party may be released from the obligation of a negotiable instrument, its provision must be regarded as precluding such relief to all parties not within the class described.* The term 'secondarily liable' is defined by § 6494, also a part of the new law, in these words: 'The person primarily liable on an instrument is the person who by the terms of the instrument is absolutely required to pay the same. All other parties are secondarily liable.' *It seems clear that, if by the adoption of the new law a guarantor of payment can be said to be included in the class of parties primarily liable on the instrument, appellant would not be released from his obligation by the extension of time given to Drayton Milling Company as such act now operates to release only those secondarily liable.*" 19 N. D. 512.

(Later in the opinion, however, the court indicated that the question, whether, under the Negotiable Instruments Law, the principles of suretyship apply to parties to negotiable instruments, was not decided).

In First Nat. Bank v. Meyer, 30 N. D. 288, 152 N. W. 657, an accommodation maker asserted "as a complete *defense*" that he was an accommodation maker, and known by the payee in the note to be such; that prior to the commencement of the action against (defendant) the accommodation maker, the payee in the note had recovered judgment against the principal maker; and, also, a judgment against a garnishee; that the (plaintiff) judgment creditor had made "a settlement" of the judgment against the garnishee for less than the amount of the judgment entered against the garnishee. There was no allegation and no contention that in the settlement the garnishee did not in fact pay every cent it owed to the defendant in that action. The trial court

held that the accommodation maker was not discharged from liability by reason of the compromise and release of the judgment against the garnishee, and that he could offset against the note only the amount which had actually been collected in settlement of the garnishment judgment. On appeal to this court it was asserted that "an accommodation maker on a promissory note is, in fact, a surety and entitled to all the rights of such." 30 N. D. 391. And the case was submitted to this court on the theory that this was the controlling question in the case, and apparently that was the theory on which it had been tried and decided in the court below. This court decided the case on the theory on which it was submitted to it, and held that an accommodation maker is not entitled to the rights of a surety.

The question was again alluded to (though not decided) in Scandinavian American Bank v. Westby, supra. In that case only one member (Mr. Justice Grace) of the court deemed the present question under consideration involved, and he expressed the view that the statutory provisions relating to suretyship were applicable to an accommodation maker, and that an extension of time to the principal debtor would exonerate such maker from all liability; two of the justices (Mr. Chief Justice Bruce, and the writer) stated that they disagreed with the views expressed by Mr. Justice Grace, but stated that the question was not involved in that case (41 N. D. 295, 296); one justice (Mr. Justice Birdzell) stated that he refrained from expressing any opinion upon the question at all (41 N. D. 300); and one justice (Mr. Justice Robinson) made no reference to the matter at all, but expressed the opinion that the judgment which had been rendered against the accommodation maker should be affirmed (Pratt v. Huber Mfg. Co. 41 N. D. 301, 171 N. W. 246).

In view of the suggestion that Scandinavian American Bank v. Westby, supra, is a departure from the rule announced in First Nat. Bank v. Meyer, supra, and, in effect, holds that an accommodation maker may invoke the statutory provisions relating to suretyship in exoneration of liability, I deem it desirable to state the questions presented on appeal, and the facts as disclosed by the record, in that case. I quote from my concurring opinion in that case:

"As already stated I do not believe that the rule announced in First Nat. Bank v. Meyer is at all involved in this case. It is true the

plaintiff in its brief argues that the defendant is primarily liable, and cites First Nat. Bank v. Meyer, in support of its argument. But the defendant does not deny this, or question the correctness of First Nat. Bank v. Meyer. Neither does the defendant contend that he is discharged from liability upon the note by reason of plaintiff's surrender of the collateral security. On the contrary, defendant concedes liability on the note, and merely *asks that the damages which he has sustained by reason of plaintiff's breach of contract be offset against the amount due on the note.* In his brief defendant says: 'This is a suit on a promissory note and the indebtedness is admitted in the *answer, but there is a counterclaim for the value of the collateral security which the defendant says the plaintiff converted.'* And in defendant's reply brief the same proposition is most emphatically adhered to. He says: 'We did not urge that the passive negligence of Hagen (the president of the plaintiff bank) when Stafne seized the stock, and his ratification of Stafne's forcible annexation of it, in face of Westby's warning, and in disregard of his duty as a bailee . . . discharged Westby. We interposed plaintiff's conversion as a counterclaim and offset, not a defense. We did not urge that the fact that Hagen permitted Stafne to take and keep twenty shares of bank stock of which he was trustee and which he was under legal duty to preserve with "at least ordinary care," discharged Westby. . . . We urged his neglect of duty as a bailee and his presentation of the stock to another as a counterclaim. . . . It is "to the extent to which he is prejudiced" upon which the counterclaim is based.' There should be no difficulty in understanding defendant's position. It could not have been stated more clearly and unequivocally.

"The evidence shows that the original loan was made for $1,745.90. It was evidenced by a promissory note for that amount signed by J. A. Stafne, dated August 8, 1911, payable November 1, 1912. The note was secured by collateral consisting of stock in the Williston State Bank of the par value of $2,500, and stock in the Citizens State Bank of Alexander of the par value of $2,000. The certificates in the latter bank were in the name of J. A. Stafne, but the certificates in the Williston State Bank were in the name of A. J. Stafne. The two Stafnes were brothers and both interested in the Citizens State Bank of Alexander. About two years thereafter the defendant Westby acquired

the interest of John and Albert Stafne in the Williston State Bank stock so pledged to and held by the plaintiff as collateral. Arrangements were made whereby the plaintiff bank agreed to release the Williston State Bank stock in consideration of Westby's signing with Albert Stafne a renewal note for the amount of the principal and interest accrued on the original note. Such renewal note was executed by Westby. It bears date November 28, 1913. This latter note was renewed on March 25, 1914. It was again renewed on November 20, 1914, when the note involved in this action was executed. It is undisputed that Westby was not a party to the original transaction, and that the renewal notes included no consideration except the principal and accrued interest on the original loan. *It is also clearly established that Westby executed the note dated November 28, 1913, with the absolute understanding that the $2,000 stock in the Citizens State Bank of Alexander would continue to be held by the plaintiff as collateral security, as well as with the assurances of Mr. Hagan that such stock furnished ample security for the payment of the indebtedness. It is also established that Westby executed the renewal note involved in this action, with the continued understanding that the bank stock should remain security as before.* Thereafter the Citizens State Bank of Alexander got into financial difficulties, and the State Examiner required that John and Albert Stafne sever connections with the bank, and that $17,000 of notes of doubtful value be replaced. One Eric Stafne took the objectionable notes, and paid into the bank in place thereof $17,000 in cash. After this replacement had been made the plaintiff bank permitted the bank stock which it held as collateral security to come into the hands of Eric Stafne, and, after new certificates had been issued in his name, Stafne sold and transferred them to others. *The evidence leaves no room for doubt but that it was always the understanding of the plaintiff and defendant as well as of Eric Stafne that the bank stock should remain as collateral security for the note involved in his action.*"

This statement is, I think, a sufficient answer to any contention that Scandinavian American Bank v. Westby, 41 N. D. 276, 172 N. W. 665, announced any doctrine at variance with First Nat. Bank v. Meyer, supra.

In my opinion the rule announced in the instant case, viz., that an

accommodation indorser, who indorses a promissory note before de-livery, is not entitled to invoke the provisions of § 6683, Comp. Laws, 1913, in exoneration of the liability assumed by his indorsement, is correct; and in accord with the former decisions of this court.

BIRDZELL, J. (dissenting). This case may properly be said to be thoroughly enveloped in a mist of codification. The questions involved would not be at all difficult of solution if the statutory law were all placed to one side. The defendant Stary, having undertaken as maker of the note to pay, and the defendant Sutherland likewise having undertaken as indorser to pay and having broken his promise would, of course, be liable without qualification aside from statutes. It would not be a sufficient defense for him to assert that his efforts to persuade the creditor to pursue its remedies against Stary had been unavailing and that his rights had been impaired by reason of the delay. The answer to such a defense would be that he had it in his own power to protect his rights by simply paying the obligation according to his own agreement and pursuing whatever remedies he or the creditor had against the principal debtor. Any loss he might have sustained would not be directly chargeable to the delay or non-action of the creditor. Such would be the solution in the absence of statute, according to the overwhelming weight of authority. 21 R. C. L. 1035; 1 Brandt, Suretyship & Guaranty, 3d ed. § 116.

However, a solicitous regard for the welfare of the surety has caused another view of the surety's rights in the premises to gain some foothold in the law. In Pain v. Packard, 13 Johns. 174, 7 Am. Dec. 369, and King v. Baldwin, 17 Johns. 384, 8 Am. Dec. 415, the doctrine was announced that the failure of the creditor to pursue the principal debtor when requested so to do by the surety, followed by the subsequent insolvency or absconding of the principal, would operate to discharge the surety. This rule has become expressed in some form or another in the statute law of a number of American states, including Alabama, Arkansas, California, Georgia, Illinois, Indiana, Iowa, Kentucky, Mississippi, Montana, North Carolina, North Dakota, Oklahoma, South Dakota, Tennessee, Texas, Virginia, West Virginia, and perhaps other states. The North Dakota statute reads (Comp. Laws, 1913, § 6675):

"A surety is one who at the request of another and for the purpose of securing to him a benefit becomes responsible for the performance by the latter of some act in favor of a third person or hypothecates property as security therefor."

And § 6683 provides:

"A surety may require his creditors to proceed against the principal or to pursue any other remedy in his power, which the surety can not himself pursue and which would lighten his burden; and if in such case the creditor neglects to do so, the surety is exonerated to the extent to which he is thereby prejudiced."

It would seem to be quite plain, aside from the Negotiable Instruments Act, that one who is not otherwise a party to a negotiable instrument and who indorses it before delivery at the request of another for the purpose of securing to the latter a benefit, thereby becomes responsible for the performance by the latter of his obligation to pay the face of the note to a third person and is a surety within the definition contained in § 6675, supra. It would seem equally plain that one in that position would have a right to accelerate the movements of the creditor under § 6683, supra, at the peril of the latter losing rights against the surety to the extent of the resulting prejudice. (It is not intended to intimate here that one, who is not an accommodation indorser and who indorses, not for the benefit of another, but to subserve some purpose of his own, would be entitled to the rights of a surety under this statute even though he might have a right of recourse against prior parties).

In fact, prior to the passage of the Negotiable Instruments Act and concurrently with the codification of the law of suretyship appearing in our code, the irregular indorser was presumptively a co-maker in many jurisdictions and clearly entitled to avail himself of his rights as a surety if he were such in fact. As was said in Story on Promissory Notes, § 58, the maker and an irregular indorser are both deemed original promisors, and the note a joint and several promissory note to the payee, although as between the maker and the other party they stand in the relation of principal and surety. See Good v. Martin, 95 U. S. 90, 24 L. ed. 341; Good v. Martin, 1 Colo. 165, 91 Am. Dec. 706; Tabor v. Miles, 5 Colo. App. 127, 38 Pac. 64; McCallum v. Driggs, 35 Fla. 277, 17 So. 407; Bradford v. Prescott, 85 Me. 482,

27 Atl. 461; Schroeder v. Turner, 68 Md. 506, 13 Atl. 331; Gumz v. Giegling, 108 Mich. 295, 66 N. W. 48; Peninsular Sav. Bank v. Hosie, 112 Mich. 351, 70 N. W. 890; Dennis v. Jackson, 57 Minn. 286, 47 Am. St. Rep. 603, 59 N. W. 198; Schultz v. Howard, 63 Minn. 196, 56 Am. St. Rep. 470, 65 N. W. 363; Richardson v. Foster, 73 Miss. 12, 55 Am. St. Rep. 481, 18 So. 573; Mastin Bank v. Hammerslough, 72 Mo. 274 (cf. First Nat. Bank v. Payne, 111 Mo. 291, 33 Am. St. Rep. 520, 20 S. W. 41); Salisbury v. First Nat. Bank, 37 Neb. 872, 40 Am. St. Rep. 527, 56 N. W. 727; Sargent v. Robbins, 19 N. H. 572; McFetrich v. Woodrow, 67 N. H. 174, 38 Atl. 18; Hoffman v. Moore, 82 N. C. 313; Ewan v. Brooks-Waterfield Co. 55 Ohio St. 596, 35 L.R.A. 786, 60 Am. St. Rep. 719, 45 N. E. 1094; Jackson Bank v. Irons, 18 R. I. 718, 30 Atl. 420; Sylvester Bleckley Co. v. Alewine, 48 S. C. 308, 37 L.R.A. 86, 26 S. E. 609; Provident Sav. Life Soc. v. Edmonds, 95 Tenn. 53, 31 S. W. 168; Barton v. American Nat. Bank, 8 Tex. Civ. App. 223, 29 S. W. 210; National Bank v. Dorset Marble Co. 61 Vt. 106, 2 L.R.A. 428, 17 Atl. 42; Donohoe-Kelly Bkg. Co. v. Puget Sound Sav. Bank, 13 Wash. 407, 52 Am. St. Rep. 57, 43 Pac. 359, 942.

Before entering upon an inquiry to determine whether or not an irregular indorser, who is in fact a surety, may, since the adoption of the Negotiable Instruments Act, still assert his rights as surety, it is essential to determine the extent of the waiver on the note in suit; for if the defendant Sutherland has waived whatever rights he might have as a surety, as held in the majority opinion, it is manifestly unnecessary to consider the character and extent of the rights waived. The waiver on the note in suit is in these words: "The makers and indorsers each guarantee the payment of this note and waive demand, protest and notice of non-payment, and consent to any extension of time of payment or renewal thereof without notice." In the majority opinion it is said that this language is broad enough to include a waiver of the statutory right of a surety to accelerate the movements of the creditor by notice as provided in § 6683, Comp. Laws, 1913, and the cases of Owensboro Sav. Bank & T. Co. v. Haynes, 143 Ky. 534, 136 S. W. 1004, and Archenhold Co. v. Smith, — Tex. Civ. App. —, 218 S. W. 808, are cited in support of such holding. In my opinion the waiver is not properly construed by the majority and the cases cited

are not in point. The defendant Sutherland does not claim to have been prejudiced by reason of the failure of the creditor to collect from Stary during any period covered by an extension of time or renewal contracted between the bank and Stary. He claims to have been injured through *indulgence* of the principal debtor after notice to the creditor to collect. The manifest purpose of a waiver such as that contained in this note is to obviate the technical defenses that sureties or indorsers may assert, where there has been a contractual extension of time without consent or a failure to make demand and give notice, even though no actual damage ensues. In the Kentucky case the stipulation waived *"diligence in bringing suit* against any party hereto, either maker or indorser,"* and the court, in construing it, said: "Diligence in bringing suit, being the thing waived, it is immaterial whether there is an absence of diligence under the common law, or an absence of diligence after notice given pursuant to the statute." And this is manifestly correct. In the note involved here, however, there is no waiver of *diligence in bringing suit.* Likewise, in the Texas case the stipulation embodied an express waiver of *"diligence in bringing suit* against any party hereto."* It would seem that the waiver in the case at bar is more analogous to that involved in the case of Trustees of Schools v. Southard, 31 Ill. App. 359, which was in these words: "and no extension of time of payment with or without our knowledge, by the receipt of interest or otherwise, shall release us, or either of us, of the obligation of payment." And it was there said (page 363) "that agreement cannot be held to be a *perpetual waiver of a right given by the statute to the defendants, to demand an effort at collection by the payee for the protection of the surety."* In my opinion, such is the correct construction of the stipulation in question here.

Since, then, the right of the surety to accelerate the movements of the creditor, if such right exists, has not been waived, there remain for consideration the character and extent of the right claimed, the question of whether or not an accommodation, anomalous, indorser has such right under § 6683, Comp. Laws, 1913, and whether or not the right is affected by any provision of the Negotiable Instruments Law.

In the majority opinion it is stated:

"The fundamental question, therefore, is whether an accommoda-

51 N. D.—28.

tion indorser, who indorses before delivery, a promissory note containing the waivers and consent to extensions of time, incorporated in the note in suit, may relieve himself from liability thereon by notifying the creditor payee to proceed against the principal debtor under the provisions of § 6683, Compiled Laws of 1913."

It is submitted that this statement of the question is not accurate. The statute upon which the defendant relies does not purport to relieve him from liability upon the service of notice to proceed against the principal debtor. The full effect of the statute is merely to exonerate the surety to the extent to which he may be prejudiced by the failure of the creditor to attempt collection from the principal debtor. The defendant's contention here, as I understand it, is not that he is relieved of liability by serving the notice, but that he is exonerated to the extent of the prejudice sustained by the failure of the plaintiff to proceed against the principal debtor when requested so to do. Again, in discussing certain Oklahoma cases, the principal opinion, by implication at least, erroneously states the defendant's contention as I understand it. It is said that it is held in Oklahoma, under facts very similar to and scarcely distinguishable from the facts in the case at bar, that the surety cannot, by demand, compel the creditor to sue the principal maker *before the former may require the surety to pay the note.* I do not understand it to be contended by the defendant that, by service of notice on the creditor to proceed against the principal debtor, he compels the creditor to sue the principal debtor before he (the surety) may be required or compelled to pay the note or that he (the surety), through the notice, in any way postpones or qualifies his obligation. Certainly, the statute upon which the defendant relies does not purport to suspend any remedy which the creditor has against him. The most it does is to impose a duty on the creditor to proceed promptly against the principal and to exonerate the surety only to the extent of any prejudice he may sustain by reason of the failure to thus proceed. The statute, for instance, would not prevent an immediate action by the creditor against both the principal debtor and the surety and the obtaining of a judgment against both in the same action. It suspends no remedy; it merely imposes upon the creditor a duty of prompt action against the principal debtor. Bingham v. Mears, 4 N. D. 437, 27 L.R.A. 257, 61 N. W. 808.

It is said that the rule prevailing before the Negotiable Instruments Law was adopted was that an accommodation indorser did not stand in the relation of a surety to the maker so as to be within the provisions of statutes giving the surety the right to enforce remedies against the principal debtor or to require the creditor to proceed against the principal debtor. Authorities are cited for this statement which appear to support it. However, the statement, in my opinion, is of no value in determining the meaning of a statute like ours, and the authorities are only in point to the extent that they arose in a similar or analogous situation. A statute may be so framed as to leave no room whatever to doubt its application to sureties who occupy that relationship by virtue of having signed an instrument on the back as well as to sureties who have signed it on the face. For instance, in the revised statutes of Texas for 1893, it was provided in article 3819 that "the remedy provided for sureties in this title extends to indorsers, guarantors, drawers of bills which have been accepted, and every other suretyship, whether created by express contract or operation of law." See Williams v. J. Ogg & K. Lumber Co. 42 Tex. Civ. App. 558, 94 S. W. 420. To like effect are the statutes of Virginia and West Virginia, Virginia Code, 1904, § 2890 (Edmondson v. Potts, 111 Va. 79, 68 S. E. 254, 21 Ann. Cas. 1365); Barnes's Code (W. Va.) 1916, chap. 101, p. 1040. Or the statute may be so drawn as to be somewhat ambiguous in its application and hence open to construction, in which event it may be so construed as not to give to one who is an accommodation indorser a right as a surety when the right claimed is in derogation of the common law. The extent to which considerations of this sort may have contributed to the decisions supporting the general statement in the majority opinion, will more amply appear upon examination of the cases, and it will also appear that *in none of them was the situation completely analogous to the case at bar,* with the exception of the Oklahoma cases. The chief difference to be noted is this: In this state the legislature has attempted to codify the law of suretyship in its entirety as well as the law of negotiable instruments, and in so far as there is any presumed intention that the codification shall be a complete expression of the rules of law governing the particular branch, it is as applicable to the suretyship code as to the Negotiable Instruments Act. The rigid rules against repeals by im-

plication are applicable with all their force as between these two attempts at codification, and it is only by virtue of the fact that the Negotiable Instruments Law was enacted later in point of time that the principle of repeal, or partial repeal, by implication can be invoked. Hence, the statutes governing the suretyship relation must stand with all their force unless clearly repugnant to the Negotiable Instruments Act.

The chapter of the Civil Code expressing the law of suretyship starts with the definition that a surety is one who at the request of another and for the purpose of securing to him a benefit becomes responsible for the performance by the latter of some act in favor of a third person or hypothecates property as security therefor. There can be no question whatsoever, in my judgment, that a person who signs a negotiable instrument as a comaker and who is in fact a surety for one or more of the makers or for other parties and known by the payee or creditor to be such, is a surety within this definition, and it would seem to be obvious that an accommodation indorser is just as clearly a surety as is an accommodation maker. As heretofore pointed out, the liability of both was presumptively the same in many jurisdictions when our suretyship statutes were passed. The suretyship under our code definition does not depend upon the form of the contract (See Fowler v. Alexander, 1 Heisk. 425) that is, upon whether it be the contract of a maker or the contract of an indorser, it depends wholly on the purpose and the relationship. Was the purpose of the liability assumed that of securing to another a benefit and does the one signing become responsible for the performance by the person benefited of some act in favor of a third person? If so, he is a surety. This definition, it will be noted, excludes an ordinary indorser from the position of surety because the ordinary indorser does not indorse in order to secure to another a benefit, but he indorses for the purpose of transferring his own title and securing to himself a benefit. Not so, however, with an accommodation indorser. It would seem, therefore, that before it can be said that an accommodation indorser does not stand in the relation of a surety to the maker of the note, within a suretyship statute like ours, it must be demonstrated that the accommodation indorser does not come within the definition of a surety laid down in the first section of the suretyship code

In the authorities cited in the majority opinion, the courts were not called upon to apply a definition of suretyship such as that contained in our statute. It seems they were concerned only with an isolated statute purporting to give a surety the right to enforce diligence on the part of the creditor and they were free to and did define the term surety within such a statute so as to exclude an accommodation indorser. In view of our statute, this cannot be done in this state without modifying the statutory definition of a surety. Hence, the authorities cited are not, in my opinion, persuasive, much less conclusive.

As to the Oklahoma cases, Palmer v. Noe, 48 Okla. 450, 150 Pac. 462, and National Bank v. Lowrey, 57 Okla. 304, 157 Pac. 103, they do hold, in accordance with the weight of authority prevailing where no statute imposes diligence upon the creditor, that the surety has not the right to compel the creditor to proceed against the principal debtor and that his remedy is to pay the debt in accordance with his undertaking as surety and himself proceed against the principal debtor. It can not be disputed that such a measure of protection is ordinarily adequate and within the power of the surety and that he may not claim exoneration where the creditor fails to comply with his demand. But such is not the rule of our statute, nor is it the rule in those states where statutes have been enacted giving to the surety the right to require the creditor to proceed against the principal debtor and specifically exonerating him if he is prejudiced by the failure to comply with the demand. The Oklahoma statute to that effect is in all substantial particulars the same as ours, and, in my opinion, where such a rule exists, it is not competent for the court to ignore it and follow the decisions adhering to the common law rule. The Oklahoma cases do this. They do not seem to construe the statute; they set it aside.

However, in this state there was never any doubt, prior to the adoption of the Negotiable Instruments Act, that an accommodation indorser was entitled to all of the rights of a surety under the suretyship statute. For it was expressly provided in the original Negotiable Instruments Act (Rev. Codes 1899, § 4882, Levisee's Code of 1883, § 1850, Rev. Codes (Dak.) for 1877, § 1850, Commissioners' Draft of Civil Code for the state of New York, 1862), that one who indorses for the accommodation of another has all the rights of a surety

as defined by the chapter on suretyship and is exonerated in like manner with respect to everyone having notice of the facts.   See also 2 Dan. Neg. Inst. 6th ed. §§ 1304, 1305.   So, obviously, it could not be doubted that prior to 1899 in this state an accommodation indorser was exonerated to the extent of any damage occasioned by the failure of the creditor, upon notice, to pursue remedies against the principal debtor. When the Negotiable Instruments Law was adopted in 1899 it was not accompanied by any express repeal of existing statutes.   Hence, all discussion as to whether or not an accommodation indorser was, prior to 1899, within the suretyship statute is clearly beside the question.   The question is narrowed down to this:   Does the Negotiable Instruments Law repeal the pre-existing law on that subject?   If it does so, it is by implication merely, and I can find no provisions of the act from which any such implication arises.   The act is wholly silent on questions of the suretyship relation and exoneration.

It would seem to be elementary that the relation of suretyship is dependent wholly, upon the arrangements between the parties to an obligation and that there is nothing in the contract of a maker, drawer, acceptor or indorser of a negotiable instrument, as such, that militates against the existence of the relation between the various parties; except, however, that an indorser who negotiates for purposes of his own is not in a position to assert the full rights of a surety, since he has assumed the burdens of an independent contract based upon an independent consideration beneficial to himself; whereas, on the other hand, an accommodation indorser, like an accommodation maker, is ordinarily a surety for some other party.   See Hereford v. Chase, 1 Rob. (La.) 212; Dunn v. Parsons, 40 Hun, 77.

Neither, in my opinion, does the fact that the Negotiable Instruments Law provides that the irregular indorser is liable as indorser preclude his occupying a position of suretyship.   The purpose of the adoption of this section (64 Negotiable Instruments Act, § 6949, Comp. Laws, 1913) is clear.   It was to fix definitely the status of one who had placed his name upon the back of an instrument before delivery so that there could be no question as to whether he should be treated as primarily or secondarily liable.   The diversity of decision was such that, in the absence of a definite, uniform rule, it could not be de-

termined by the holder whether demand and notice were necessary to fix the liability of one so indorsing.

Since it must be admitted that Sutherland is one who at the request of Stary, and to secure to him a benefit, became responsible for the payment of Stary's note to the bank, he is a surety for Stary with the liability of an indorser instead of a maker. Being such surety, he is exonerated by virtue of § 6683 to the extent to which he was prejudiced by the failure of the bank to proceed against Stary when required so to do, unless the Negotiable Instruments Act provides to the contrary.

Starting with the assumption that Sutherland became liable to the bank as indorser, that he made every engagement to the bank that an indorser makes, which concessions are required by various provisions of the Negotiable Instruments Law, the question narrows down to this: May he show that he was in fact a surety and known by the payee to be a surety and then further show that the payee has exonerated him by the failure to take the steps required by § 6683? In my opinion, this question should be answered in the affirmative.

The argument that a surety may not be thus exonerated is generally supported by §§ 119 and 120 of the Negotiable Instruments Law, Comp. Laws, 1913, §§ 7004 and 7005 and runs as follows: It is said that § 119 provides the circumstances in which a negotiable instrument is discharged and that a primary party may be discharged only by an act which discharges the instrument. First Nat. Bank v. Meyer, 30 N. D. 388, 152 N. W. 657; and that § 120 states the conditions in which a person secondarily liable on the instrument is discharged and that these are exclusive. As the acts which exonerate a surety from liability pro tanto are not included within either of these sections and as they are regarded as stating the sole grounds upon which parties to a negotiable instrument may be discharged, it is said that a surety cannot show acts of exoneration. German American State Bank v. Watson, 99 Kan. 686, 163 Pac. 637.

In the case of First Nat. Bank v. Meyer, supra, this court was called upon to determine the effect upon the liability of an accommodation maker of a compromise settlement with a solvent garnishee for a less amount than the judgment against the garnishee, and it adopted the view that the accommodation maker might not show the prejudice

to his rights resulting from the satisfaction of the judgment because he had assumed a primary obligation which could not be discharged except in one of the ways indicated in § 119, Comp. Laws, 1913, § 7004. In so holding, the court followed the theory developed in the argument of counsel, who apparently considered that the decision should turn upon whether or not circumstances not included in Section 119, could be shown, which if proved would result in the absolute discharge of a surety at common law. In a later case, however (Scandinavian American Bank v. Westby, 41 N. D. 276, 172 N. W. 665), this court held that a maker might show that he had sustained damages by reason of the surrender of collateral security which had been pledged by one on whose behalf the note had been given and that these damages might be offset against the amount due on the note. Had the maker in this instance been a surety for a co-maker instead of an accommodation maker for one whose name did not appear, the decision surely would have been no different. If a surety may show that he is exonerated from liability to the extent of a prejudice suffered by the surrender of collateral, upon what principle can it be held that he is precluded from asserting exoneration to the extent of a prejudice suffered by the failure or refusal of the creditor to proceed against the principal debtor when requested so to do? One set of circumstances claimed as an exoneration is declared to have this effect in § 6681, of the Compiled Laws of 1913, of the suretyship codification, and the other in § 6683 of the same codification.

In view of the decision in this case and in the Westby Case, supra, it may be pertinent to inquire whether in this jurisdiction one who is in fact a surety upon commercial paper within chapter 85 of the Civil Code, the suretyship codification, may show such fact by parol for the purposes of establishing exoneration under § 6681 but not for the purpose of establishing exoneration under § 6683. If such be the condition of the law, it certainly may be said to be technical to the point of bewilderment. Note the two sections: Section 6681 says that "A surety is exonerated:

"(2) To the extent to which he is prejudiced by any act of the creditor which would naturally prove injurious to the remedies of the surety or inconsistent with his rights or which lessens his security; or,

"(3) To the extent to which he is prejudiced by an omission of the creditor to do anything when required by the surety which it is his duty to do."

And § 6683, heretofore quoted, provides:

"A surety may require his creditors to proceed against the principal or to pursue any other remedy in his power, which a surety can not himself pursue and which would lighten his burden; and if in such case the creditor neglects to do so, the surety is exonerated to the extent to which he is thereby prejudiced."

Is not the failure of the creditor to proceed against the principal debtor after notice an omission of duty within ¶ 3 of § 6681? Or are both ¶ 3 of § 6681 and § 6683 utterly devoid of meaning as applied to parties to commercial paper? No principle was better established in the law of negotiable instruments prior to the adoption of the Negotiable Instruments Act than the rule that the surrender or release by the holder of a bill or note of security for the payment of the instrument operated as a discharge of indorsers or known sureties to the extent of the value of the securities surrendered. See 8 C. J. 620; 2 Dan. Neg. Inst. 6th ed. §§ 1303 and 1311. It has been said on excellent judicial authority: "The purpose of the law (Negotiable Instruments Law) was, not to make radical changes in long established and fundamental principles, but to wipe out the many differences in minor details existing between the laws of the various states by adopting in each case of difference that uniform rule which was best adapted to the needs of the business world. The idea was to secure uniformity by wiping out small differences, not to change the general principles of commercial law." State Bank v. Michel, 152 Wis. 88, 139 N. W. 748, 1131. Is it consistent with such purpose to ascribe to the legislatures of the various states a purpose to wipe out a wholesome and just principle of universal operation on no stronger evidence than that afforded by the failure to incorporate in the Negotiable Instruments Law an express provision governing exoneration or discharge pro tanto of the liability of a party on account of the failure or refusal of the creditor to respect the rights ordinarily attaching to his position? To me it seems more reasonable to construe sections 119 and 120 as providing for exactly what they purport to provide for, namely, the *discharge* of an instrument and the *discharge* of secondary parties, meaning *the full dis-*

*charge,* and that the failure to provide for discharges pro tanto or ex-
oneration of various parties, leaves such matters to be determined, as
formerly, according to consistent principles of universal application
and dependent upon the relationship of the parties as between them-
selves. And such is, in effect, the decision in Scandinavian American
Bank v. Westby, supra.

Notwithstanding the apparent weight of judicial authority support-
ing a rigid and literal construction of §§ 119 and 120 of the Negotia-
ble Instruments Act, §§ 7004 and 7005, Comp. Laws, 1913, which
tends to defeat the well established rights of sureties, (See Brannan,
Neg. Inst. Law, 3d ed. pp. 311–331) there is a very evident trend
in the opposite direction. Milner v. Eskridge, 62 Colo. 430, 163 Pac.
1115; Southern Nat. Life Realty Corp. v. People's Bank, 178 Ky.
80, 198 S. W. 543; Kopf v. Yordy, 200 Ill. App. 409; Id. 208 Ill.
App. 580; Fullerton Lumber Co. v. Snouffer, 139 Iowa, 176, 117 N.
W. 50; Auto Brokerage Co. v. Morris & S. Auto Co. 106 Misc. 147,
174 N. Y. Supp. 188; Frazier v. First Nat. Bank, 34 Ohio C. C. 508.

In the Ohio case supra it is interesting to note that the defendant
was an accommodation indorser; that he claimed he should be pro-
tected in his right to have collateral securities applied toward the pay-
ment of the debt; and that there was pressed upon the court of appeals,
in answer to his contentions, the decision of the Supreme Court of
Ohio in the case of Richards v. Market Exch. Bank Co. 81 Ohio St.
348, 26 L.R.A.(N.S.) 99, 90 N. E. 1000. (It was upon this case that
this court rested its decision in the case of First Nat. Bank v. Meyer,
supra). The court of appeals in answering the argument supported by
the Richards Case, said: (page 511).

"Richards v. Market Exch. Bank Co. supra, was a case involving the
discharge of the instrument itself, while the case at bar is one in which
the defendant sought protection of his rights as surety by insisting upon
the fulfillment of the contract whereby collateral security had been de-
posited for his benefit and we think that case is not inconsistent with
his claim.

"If the argument of counsel for the bank is sound, then it would
be possible in every case for a payee of negotiable paper holding col-
lateral security to release the same at will and thereby deprive the

surety of all protection. We can not believe, nor hold, that a surety, under such circumstances, is without remedy.

"The subject of collateral security now under consideration does not appear to be embraced within the negotiable instrument statute, and it is provided in said statute, in Section 8300 G. C. that any case not provided for, should be governed by the rules of the law merchant. By those rules, Frazier (the accommodation indorser) would be entitled to the relief sought by him, if the allegations of his pleading are sustained by the evidence."

In the New York case (Auto Brokerage Co. v. Morris & S. Auto Co. 106 Misc. 147, 174 N. Y. Supp. 188), an indorser was held exonerated to the extent of a lien lost by virtue of the failure of the creditor to record a chattel mortgage, the maker of the note being bankrupt. And in the Illinois case (Kopf v. Yordy, 200 Ill. App. 409, id. 208 Ill. App. 580), the same principle was applied in an action against an irregular, accommodation indorser. It was there held that where the creditor, by his laches, had deprived an accommodation indorser of the benefit of securities, whereby he had been injured, the latter might assert in defense, when sued on the note, his exoneration to the extent of the injuries suffered. It was further held that parol evidence might be properly admitted which would show the circumstances in which the indorsement was made, notwithstanding the provisions of the Negotiable Instruments Act which fix the nature of the contract and the liability of the irregular indorser.

In the case of Haddock, B. & Co. v. Haddock, 192 N. Y. 499, 19 L.R.A.(N.S.) 136, 85 N. E. 682, it is held that an irregular accommodation indorser, whose liability is fixed by § 64 of the Negotiable Instruments Act, § 6949, Comp. Laws, 1913, as that of an indorser, may introduce parol evidence for the purpose of determining the primary liability as between the parties whose names appear upon the instrument or as between parties secondarily liable. It is further held that the declaration in the Negotiable Instruments Act, to the effect that an irregular indorser is liable as indorser to certain parties, does not alter the pre-existing law according to which parties to an instrument were permitted to establish by parol evidence the true relationship between them.

These holdings and others, which might be cited, are consistent with

various provisions of the act under which parol evidence must be resorted to to give them effect. It is expressly provided, for instance, in § 68 (Comp. Laws, 1913, § 6953) that evidence is admissible as between indorsers to establish the order in which they have agreed to be liable. Under §§ 80 and 115, §§ 6965 and 7000, Comp. Laws, 1913, parol evidence may be resorted to to establish that one appearing to be secondarily liable is an accommodated party and hence not entitled to presentment and notice of dishonor.

If such a degree of liberality prevails under the act with respect to matters of liability that parol evidence may be resorted to to give effect to arrangements made between parties, why should there be a strict regard for purely negative implications where matters of liability are not concerned, and where it is sought only to show that a relationship exists, to the knowledge of the creditor, which carries with it certain obligations, presumably based on equitable considerations?

In my opinion, the right of a surety to exoneration based upon the failure of a creditor to proceed against the principal debtor after notice given is, under our statutes, on an exact par with the right of exoneration which rests upon other circumstances stated in the statute and which exonerate a surety pro tanto. And if the right of exoneration to the extent of prejudice suffered through the lessening of security, for instance, continues to exist after the adoption of the Negotiable Instruments Act, as is clearly indicated by the weight of authority (notwithstanding the tendency to construe as exclusive §§ 119 and 120 of the act, §§ 7004 and 7005, Comp. Laws, 1913), I fail to perceive any valid reason why the similar right, where clearly given by statute, based on neglect to proceed against the principal debtor after notice given, should not likewise continue to exist. It will not do to say that a distinction exists because the basic equity is stronger in the one case than in the other. The legislature has determined that matter and it is not competent for the courts to construe all the meaning out of a statute, because it may not agree with the legislature as to the policy expressed. It should require something more than a mere negative implication or omission from sections dealing with the *discharge* of an instrument and of secondary parties to accomplish a virtual repeal of express statutory provisions enacted for the purpose of

fixing the rights of parties sustaining certain relationships to one another. Full effect can be given to the codified principles of surety-ship as contained in chapter 85 of the Civil Code without conflicting with any express provision of the Negotiable Instruments Act and vice versa. In my opinion chapter 85 of the Civil Code still governs the relations of parties to negotiable instruments as between themselves if they are in fact sureties, and in doing so, it does not qualify in the slightest degree their liability as parties to commercial paper. Any ultimate effect upon liability is due to the subsequent failure of the creditor to respect fundamental statutory rights attaching to a generally recognized relationship; not to any original qualification whatsoever of a liability which the Negotiable Instruments Act renders certain and unambiguous.

In the instant case as Sutherland had not waived his right to require the bank to proceed against Stary, he should have been permitted to show the damage, if any, sustained by him, through whatever indulgence was granted not based upon any extension contracted prior to the service of the notice by him.